[No. F020816. Fifth Dist. July 5, 1995.]

THOMAS E. KALJIAN et al., Plaintiffs, Cross-defendants and Respondents, v.
RICHARD MENEZES et al., Defendants, Cross-complainants and Appellants.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II, III, IV, and V of Discussion.

COUNSEL

Lillick & Charles and Robert Fremlin for Defendants, Cross-complainants and Appellants.

Kimball, MacMichael & Upton, Jon Wallace Upton, D. Tyler Tharpe and Mary Ann Bluhm for Plaintiffs, Cross-defendants and Respondents.

OPINION

**THAXTER, J.**—Respondents Thomas E. Kaljian and Todd Merrill recovered judgment based on a jury's special verdict against appellants Richard Menezes,[1] Herman Menezes, John Menezes, and Triple M Cattle Company. The judgment was for $2,165,111, consisting of $2,090,375 in contract damages, $49,736 in fraud damages, and $25,000 in punitive damages. The action arose from Menezes' termination of an alleged oral agreement for the development of certain real property owned by Menezes.

We will conclude that prejudicial error occurred when the trial court rejected Menezes's request for jury instructions on the statute of frauds. We will thus remand for retrial on the contract cause of action. In all other respects we will conclude the judgment was error free.

### FACTS

In or around 1980, Menezes donated a 10-acre parcel of land outside Los Banos (hereinafter the City) as a site for a branch of Merced Junior College. He retained adjacent property of about 150 acres (College Greens) with the hope of eventually annexing it to the City and developing it as residential property.

Development of College Greens was not reasonably possible until the property was annexed to the City. Early steps toward annexation faltered

---

[1]Richard Menezes represented himself and all other defendants in the business dealings giving rise to this suit. For sake of simplicity, we will refer to him as if he were the sole defendant.

because of inadequate sewer capacity in the area, but by 1985 the Local Agency Formation Commission (LAFCO) approved an environmental impact report for the proposed annexation.

Menezes's primary business involved the warehousing and sale of alfalfa cubes, largely overseas. This involved making heavy expenditures during the summer months to build a large inventory for the winter, and Menezes had a line of credit with Crocker Bank to facilitate its business. Crocker was taken over by Wells Fargo Bank, and in or around May of 1985 Menezes and Wells Fargo entered into a cooperative one-year loan workout agreement for the outstanding loan balance, which was around $11 million. The workout agreement required that Menezes clear his expenditures through Wells Fargo on a weekly basis. Budget categories were set up, and Menezes could not spend anything that was not provided for in the budget. The bank made it very clear to Menezes that it was not in the development business and would not permit use of budgeted workout funds to develop property.

Late in 1985, Menezes was approached by real estate broker Thomas Kaljian, acting on behalf of Merrill & Associates, Kaljian's partnership with builder Todd Merrill. Merrill & Associates had previously done what Kaljian testified was "one very small development" on property already within the City and already served by water and sewer lines; the principals apparently had no experience with a "raw land" development. Kaljian proposed that Merrill & Associates could get the College Greens property annexed and developed.

Kaljian's initial proposal to Menezes involved Menezes putting up the money for development, but Menezes would not agree. According to Kaljian, the parties shortly reached an oral agreement in two parts. The first portion involved Merrill & Associates facilitating the annexation and rezoning of College Greens to make the land developable as residential property. Merrill & Associates would "front" the expenses involved in this process except for any money needed to obtain a release of property from the bank's deed of trust. Menezes said he believed the bank would release the deed of trust for $5,000 or $6,000 per acre, and he would "take care of getting that released."

The second part of the agreement involved development. As lots were sold, Menezes would be paid $15,000 per acre, from which he would pay Wells Fargo to release its liens on the property. Out of remaining profits, Merrill & Associates would first be compensated for its expenses; anything left over would be divided equally.

Kaljian agreed to draft a written agreement for the parties' signatures. The proposed written agreement went through various drafts over several months, but none was ever executed by any of the principals.

Kaljian perceived several significant roadblocks to the College Greens annexation, including sewer access, drainage, and the creation of a county "peninsula" surrounded by the City. In late 1985, Merrill & Associates retained the engineering firm of Larson, Ohlinger and Holmes to work on such matters. The firm had previously worked for Menezes in attempting to get College Greens annexed.

In March 1986, the Larson firm presented several alternatives to dealing with the sewer problem. The City, however, indicated that any sewer solution for College Greens would also have to include other property owners in the area who were hoping to develop their land. Kaljian contacted the various property owners and formed what became known as the South-side Sewer Group. In March 1987, the members jointly signed an agreement to share sewer construction costs. Merrill & Associates was included as a member because, although not a landowner, it was "doing the development on the Menezes property." In April 1987, the Southside Sewer Group entered into a contract with the City for sewer construction.

In the same time frame, Kaljian, as a licensed real estate broker, was involved in the sale of various properties in the vicinity of College Greens. Some of the new landowners were ultimately brought into the Southside Sewer Group. Kaljian informed Menezes that he was selling property in the area and that the new owners were being invited to join the sewer group. Menezes expressed concern that Kaljian's activities were not beneficial to the College Greens development, but after some discussion he agreed that it would be "the proper way to go."

The apportioned cost of providing sewer service to College Greens was approximately $20,000, and pursuant to its agreement with Menezes, Merrill & Associates paid this amount.

LAFCO gave its approval to annexation around January 1987, and the City annexed College Greens by resolution No. 2665 passed by the city council on June 17, 1987.

Meanwhile, Menezes had not satisfied his loan workout agreement with Wells Fargo. The original agreement had been extended a year, from mid-1986 to mid-1987. In mid-1987, the workout agreement was revised to run through January 1988. For the first time, Menezes specifically identified real property available for sale to reduce the debt; portions of College Greens were listed among those properties. Sale of these properties under the workout agreement would permit the bank to "take all the proceeds, if they wanted to." The workout agreement was later extended to March 31, 1988.

In or around November 1987, according to Kaljian, Menezes authorized Kaljian to explore the sale of portions of College Greens, and Kaljian wrote at least one letter to a broker in this regard. However, this authorization was not in writing. Kaljian's testimony suggests it was understood between the parties that Merrill & Associates would only be constructing homes on a portion of the property, and that other developers could purchase portions of the area to develop.

About January or February of 1988, according to Kaljian, Menezes and Kaljian came to an agreement regarding the substance of the final draft agreement prepared by Kaljian. However, Menezes stated he would have to show the draft contract to Wells Fargo prior to signing it, describing this to Kaljian as a "formality." Menezes later told Kaljian that Wells Fargo requested several changes to the contract.

On March 16, 1988, the City's planning director informed Kaljian that the city council had passed resolution No. 2745, approving the tentative map for phase 1 of the College Greens development. As of that date, Merrill & Associates was involved in "a number" of projects, but Kaljian was becoming concerned with the partnership's financial situation. Indeed, Merrill & Associates' $430,000 credit line with Bank of America was "maxed out" during 1987. When Merrill & Associates failed to meet a bank-mandated payoff date of December 1, 1987, Bank of America extended the payoff date to February 1, 1988; when that date was also not met, the date was again extended into 1989. Of the various construction projects undertaken by Merrill & Associates during this period, it appears the partnership lost money on virtually all of them. Kaljian appeared to place responsibility for this on Merrill, whose role it was to control building costs.

In the face of Merrill & Associates' financial problems, Kaljian and his wife applied to Guarantee Savings in February 1988 for a $652,000 construction loan to build out phase 1 of College Greens; Kaljian wrote to Will Hedge of Guarantee that he had a "formal contract" for development of College Greens. Hedge told Kaljian he could approve the loan only if Kaljian put up $215,000 himself; Kaljian did not do so, and Guarantee rejected the application in April 1988.

In March 1988, Kaljian testified he shared with Menezes his concerns regarding Merrill doing construction work at College Greens and suggested that a larger, more financially stable builder be brought in. Menezes "didn't want to go along with that." Kaljian told Menezes the boom in residential construction the City had experienced during the late 1980's made it financially risky to proceed with sinking hundreds of thousands of dollars into

off-site development and housing construction; rather, Kaljian suggested, "we could avoid all of this and essentially reach the majority of the profit" by selling off the property. Menezes responded that he wanted Merrill out of the agreement entirely. Kaljian replied that he could not do that; "even though [Merrill] wasn't going to be building, he was involved with this process all along. And he was a part of the development process."

Kaljian proceeded to make efforts to sell College Greens, although he still lacked any written authorization to sell or a brokerage agreement. On May 2, 1988, in response to inquiries by Turlock real estate agent Miniv Tamimi, Kaljian provided Tamimi with Menezes's asking price of $26,000 per acre; he had specifically checked with Menezes before doing so. Tamimi promptly brought representatives of his client, Pope Enterprises, to view the property. Thereafter, Tamimi communicated to Kaljian Pope Enterprises' verbal offer of some $24,000 per acre.

Kaljian testified that Tamimi was concerned with "protecting his commission," and he urged Kaljian to get Menezes to sign an "exclusive authorization to sell" agreement with Kaljian. On May 9, 1988, Kaljian presented such a document to Menezes for signature, but Menezes refused, unhappy with the prospect of both splitting the profits with Kaljian (pursuant to the original agreement) and giving Kaljian a sales commission as well.

Per Menezes's direction, Kaljian presented Tamimi with a counteroffer that involved slightly more money per acre, and an additional $12,000 for each of the 31 lots in phase 1. In Kaljian's words, the counteroffer "didn't fly."

Meanwhile, Los Banos real estate agent James Mohr was contacted by Pope Enterprises—the same potential purchasers who had been represented by Tamimi—seeking help in acquiring development properties in the Los Banos area. Mohr showed various properties, including College Greens, to a Pope representative. During late May 1988, on Pope's behalf, Mohr contacted Menezes (whom he knew to be the property owner) and obtained an asking price and conditions for sale. Mohr was aware that Kaljian had some relationship with the property and asked Menezes whether Kaljian had a listing agreement; Menezes assured Mohr that whatever relationship Kaljian had with the property had been terminated.

On June 2, 1988, Kaljian and Menezes met with another potential purchaser, Merced-area builder Lou Steiner. Negotiations led to a proposed price of $10,000 per lot for a portion of the property, with built-in "escalators" that would raise the per-lot price for future purchases. Because the property included an average of 4.38 lots per acre, Steiner's offer was for about $43,800 per acre.

On June 8, 1988, Pope Enterprises prepared an offer to Menezes for part of the College Greens property; specifically, the offer was of $10,000 for each phase 1 lot, or $310,000. The offer was physically delivered to Menezes by Mohr within a day or two of June 8. Menezes rejected the offer, telling Mohr "we wanted something that the developer was going to stay with the project all the way through."

On June 13, 1988, Menezes wrote a letter to Kaljian purporting to end their relationship. Shortly thereafter Kaljian and Merrill filed their complaint below and recorded a lis pendens on the College Greens property.

On June 16, 1988, Pope submitted a second offer to Menezes, again through Mohr. This offer covered phases 1 and 2, with options on the remainder of the property. After negotiation, that offer became the basis for a purchase contract dated on or about July 15, 1988. The lis pendens was expunged on September 21, 1988, and escrow closed in or around December 1988.

Menezes admitted he never told Kaljian the terms of his workout agreement with Wells Fargo, and specifically never told Kaljian that Menezes could not reimburse any of Kaljian's development expenditures without bank permission. Kaljian never would have entered into an agreement with Menezes had he known the terms of Menezes's relationship with Wells Fargo.

The case was submitted to the jury on breach of contract and fraud causes asserted by Kaljian and Merrill, and on breach of contract, fraud, and negligence causes asserted in Menezes's cross-complaint. The jury returned special verdicts finding that a contract existed between the parties, that Menezes had breached the contract causing damages in the amount of $2,090,375, and that Menezes had concealed a material fact from Merrill & Associates, causing $49,736 in damage. In addition, the jury assessed $25,000 in punitive damages. The jury found for Kaljian and Merrill on all claims raised in the cross-complaint.

## DISCUSSION

On appeal Menezes attacks both the contract and fraud bases of the judgment against him. As to the former, he claims the court committed prejudicial error by refusing his proposed instructions raising the statute of frauds, and he also contends the damage award was excessive. As to the fraud theory he argues the finding of fraud was not supported by sufficient evidence and that the award of punitive damages was improper. He does not

raise any claim of error with respect to the jury's rejection of his cross-complaint claims.

## I. *Refusal to Instruct on the Statute of Frauds Was Prejudicial Error.*

### A. *Procedural background*

Menezes's answer to the second amended complaint expressly raised the statute of frauds as an affirmative defense, pleading that Kaljian and Merrill's causes are barred by both subdivision (c) and subdivision (d) of Civil Code section 1624. That section states in pertinent part:

"The following contracts are invalid, unless they, or some note or memorandum thereof, are in writing and subscribed by the party to be charged or by the party's agent:

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(c) An agreement . . . for the sale of real property, or of an interest therein; such an agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent is in writing, subscribed by the party sought to be charged.

"(d) An agreement authorizing or employing an agent, broker, or any other person to purchase or sell real estate, . . . or to procure, introduce, or find a purchaser or seller of real estate . . . for compensation or a commission."

After Kaljian and Merrill finished presentation of their case-in-chief, Menezes moved for nonsuit. Menezes argued, among other issues, that any agreement shown by the evidence was unenforceable because it was not in writing.

After considerable discussion with counsel, the court concluded that if the relationship between the parties was a joint venture, the statute of frauds would not apply. Because the existence of a joint venture was a factual determination for the jury, the nonsuit motion was denied.

The issue arose again when the court and counsel discussed jury instructions. After agreeing to the plaintiffs' request for a single instruction defining "joint venture," the court posed the question: "Suppose this jury does not find a joint venture, is the statute of fraud applicable[?]" Menezes had

requested that four instructions be given dealing with the statute of frauds.[2] Further discussion ensued and the court referred to case law cited by the parties. Finally, the court denied Menezes's request. The jury was not instructed on any statute of frauds issue.

The special verdict forms did not ask the jury whether it found a joint venture. Instead, they simply asked whether a contract existed between the parties. The jury answered that question affirmatively.

Menezes made a motion for new trial based, in large part, on the court's refusal to give the requested statute of frauds instructions. The motion was denied.

### B. *Case law on the statute of frauds in joint ventures*

■ The trial court relied on a line of cases generally holding that agreements among partners or joint venturers regarding real property are not within the statute of frauds. (See, e.g., *Bates* v. *Babcock* (1892) 95 Cal. 479 [30 P. 605]; *James* v. *Herbert* (1957) 149 Cal.App.2d 741, 748-749 [309 P.2d 91]; *Lasry* v. *Lederman* (1957) 147 Cal.App.2d 480, 487-488 [305 P.2d 663]; *Fitzgerald* v. *Provines* (1951) 102 Cal.App.2d 529, 538 [227 P.2d 860].)

Cases so holding arise in a variety of contexts, and the courts have propounded differing rationales for enforcing oral contracts in such situations. The common factual fundament upon which they rest is the existence of a joint venture or partnership. Thus, their holdings are inapplicable here unless the parties were partners or joint venturers.

In one line of cases the agreement was to share profits from rents or sale of real property and one joint venturer or partner failed to account to the others. (*Dutton* v. *Interstate Investment Corp.* (1941) 19 Cal.2d 65, 70 [119 P.2d 138]; *Bates* v. *Babcock, supra,* 95 Cal. at pp. 486-488; *Coward* v. *Clanton* (1889) 79 Cal. 23, 26-27 [21 P. 359]; *En Taik Ha* v. *Kang* (1960) 187 Cal.App.2d 84, 90-91 [9 Cal.Rptr. 425].) In these cases the courts held that the contract was not within the statute of frauds because it did not affect title to real property; rather, the subject matter was profits. (See *Bates* v. *Babcock, supra,* 95 Cal. at p. 486.)

Other cases involved an agreement between two or more parties to purchase property for their joint account, but one took title in his own name.

---

[2]One of the proposed instructions stated simply that "The Statute of Frauds requires that all essential terms and provisions of an agreement to sell land be in writing and signed by the party to be charged." The other three dealt with agreements employing an agent or broker to sell land.

(*Koyer* v. *Willmon* (1907) 150 Cal. 785, 786-788 [90 P. 135]; *Sadugor* v. *Holstein* (1962) 199 Cal.App.2d 477, 480-481 [18 Cal.Rptr. 859]; *Jaffe* v. *Heffner* (1959) 173 Cal.App.2d 512, 516 [343 P.2d 374]; *Lasry* v. *Lederman*, *supra*, 147 Cal.App.2d at pp. 487-488; *Fitzgerald* v. *Provines*, *supra*, 102 Cal.App.2d at p. 538.) The theory underlying the rule of these cases is that the existence of a partnership or joint venture between the parties placed them in a confidential relationship. By violating his fiduciary duties, the offending party constituted himself a constructive trustee for the benefit of the others. (See *Koyer* v. *Willmon*, *supra*, at pp. 786-788.)

In some cases the oral agreement created a partnership in an existing business enterprise which, as part of its assets, owned real property. (*Nelson* v. *Abraham* (1947) 29 Cal.2d 745, 749 [177 P.2d 931]; *Clarke* v. *Fiedler* (1941) 44 Cal.App.2d 838, 848-849 [113 P.2d 275].) Because the partnership agreement did not contemplate the transfer of title from one party to another, the statute of frauds was not violated. A partnership interest does not entitle a partner to any particular portion of the business assets, but merely gives the partner a right to an accounting. (See *id.* at pp. 848-849.)

In yet another group of cases an owner of real property orally agreed to contribute it to a joint venture which, in turn, would operate or sell it. (*Epstein* v. *Stahl* (1959) 176 Cal.App.2d 53, 63-64 [1 Cal.Rptr. 143]; *James* v. *Herbert*, *supra*, 149 Cal.App.2d at pp. 748-749; *Gross* v. *Raeburn* (1963) 219 Cal.App.2d 792, 796-799 [33 Cal.Rptr. 432].) The oral promise was enforceable because creation of the joint venture had the effect of vesting title to the property in the entity, making a formal conveyance unnecessary. (See *James* v. *Herbert*, *supra*, at pp. 748-749.)

With one possible exception, discussed below, none of the cited cases dealt with an agreement which contemplated a transfer of real property from one joint venturer to another. The distinction appears critical. In an early case, *Bates* v. *Babcock*, *supra*, 95 Cal. 479, the Supreme Court considered an oral agreement under which the parties agreed to pay off encumbrances on land owned by one party, sell it, and share the profit or loss. While holding that the agreement establishing a partnership could be proven with parol evidence, even though an interest in land formed a portion of the venture's assets, the court expressly noted that the agreement "does not contemplate any transfer of land from one party to the other, or the creation of any interest or estate in lands." (*Id.* at p. 486.) The court later emphasized the distinction: "That the agreement between the parties, which is averred in the complaint, and the evidence given in support thereof, did not contemplate any transfer of the land, or of any interest therein, to the defendants, or either of them, but had for its object only a division of the profits and loss that

would remain after its sale, is shown by a consideration of the averments of the complaint hereinbefore presented, and also by the direction of Babcock to the plaintiff while negotiating the agreement to 'sell it off as soon as you can, pay up the debts, and divide the profits.' " (*Id.* at p. 488.)

The same distinction was again noted in *Dutton* v. *Interstate Investment Corp., supra,* 19 Cal.2d 65: "It is clear under recent decisions that an agreement assigning a fractional interest in the oil and hydrocarbons produced under an oil and gas lease operates to transfer an interest in real property. [Citations.] *Such a transfer of an interest in real property is required by our statutes to be in writing.* [Citations.] Under the facts of the present case, however, as disclosed by the pleadings and by the findings of the trial court, the agreement did not contemplate that plaintiff was to receive a one-third interest in the oil and gas produced under the lease. The agreement was that he was to receive one-third of the net profits ultimately realized by the Interstate Investment Corporation, and that is the effect of the judgment rendered by the trial court. *Such an agreement to share the profits from a transaction involving real estate is not required to be in writing.* [Citations.]" (19 Cal.2d at pp. 69-70, italics added.)

Likewise, in *Clarke* v. *Fiedler, supra,* 44 Cal.App.2d 838, the court, in finding the statute of frauds inapplicable on the facts presented, stated: ". . . Though we concede that certain property constituted a portion of the assets of the going business, nevertheless *the partnership contract did not contemplate the transfer of such property from one party to the other,* because the interest of one partner in the assets of the partnership does not entitle him to any particular portion of such assets, but merely confers upon him a right to an accounting with the other members of the partnership, and when the affairs of the partnership are settled, such partner shall receive the share to which he is entitled. Until the affairs of the partnership are wound up and settled the claims of the respective partners are, strictly speaking, equitable, because the only way such claims can be enforced is through an equitable action for an accounting. *The agreement with which we are here concerned therefore cannot be said to contravene the provisions of the statute of frauds.*" (*Id.* at pp. 848-849, italics added.)

The one case which arguably involved an agreement to transfer property from one joint venturer to another is *Epstein* v. *Stahl, supra,* 176 Cal.App.2d 53. In that case, the appellate court reversed the granting of a demurrer. The complaint alleged that the defendant had "agreed he would convey to plaintiff a half interest in the realty and the buildings thereon and plaintiff and defendant agreed they would thereupon convey their interests to the joint venture." (*Id.* at p. 55.) Thereafter the partners would use the defendant's assets and the plaintiff's tools, skill, and labor to renovate the apartment buildings on the property for resale. (*Id.* at p. 56.)

At least three factors distinguish *Epstein* from the instant case. First, it was heard on demurrer, and the basis for demurrer was not the statute of frauds. Second, the agreement was for the plaintiff, on transfer of the property, to reconvey it to the joint venture. Third, there was no allegation that there was a *sale* of property. Further, although the *Epstein* court cited *Bates* v. *Babcock*, *supra*, it failed to note the language we have quoted from that decision or to explain why it was inapplicable to the facts alleged in *Epstein*. For these reasons we do not regard *Epstein* as reliable authority for the proposition that the statute of frauds does not apply to an agreement by which one joint venturer or partner is to transfer an interest in real property to another member for consideration.

In summary, the trial court's reliance on the cited cases was justified only if the jury found or the evidence indisputably established a joint venture *and* if there was no substantial evidence of an agreement under which Menezes was to sell property to Kaljian and Merrill.

C. *A joint venture was not necessarily found by the jury or established as a matter of law*

■ ". . . A joint venture exists where there is an 'agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control.' [Citations.] An essential element of a partnership or joint venture is the right of joint participation in the management and control of the business. [Citation.] Absent such right, the mere fact that one party is to receive benefits in consideration of services rendered or for capital contribution does not, as a matter of law, make him a partner or joint venturer. [Citations.] An agreement by a landowner to share with another profits to be derived from the sale of land does not, without more, create a partnership or joint venture relationship. [Citations.]" (*Bank of California* v. *Connolly* (1973) 36 Cal.App.3d 350, 364 [111 Cal.Rptr. 468].)

■ The existence or nonexistence of a joint venture is a fact question for resolution by the jury. (See, e.g., *Bank of California* v. *Connolly*, *supra*, 36 Cal.App.3d at p. 364; *Frankenheimer* v. *Frankenheimer* (1964) 231 Cal.App.2d 101, 109 [41 Cal.Rptr. 636].)

While there was ample evidence from which the jury could have found a joint venture between the parties, the evidence was in sharp dispute. We note, for instance, that each of the four draft agreements prepared by Kaljian and Merrill was simply entitled "Development Contract," described the

relationship of the parties as that of "Owner and Independent Contractor," and was silent on the question of joint management and control.

The jury was given a single instruction regarding joint ventures. The instruction stated: "A joint venture is a relationship which arises only from a contract between two or more persons to undertake some common objective for the benefit of all in pursuit of which each is authorized to act for the others. Such an agreement may be expressed in words or may reasonably be implied from the circumstances.

"Whether these parties were engaged in a joint venture is an issue of fact for you to determine."

This instruction was not connected to any particular theory of liability submitted to the jury, and the jury was not told that any of its express findings were dependent upon finding a joint venture.[3] Furthermore, the special verdict forms did not require the jury to make any findings regarding a joint venture. The question submitted on the verdicts was simply whether a contract existed.

The jury might well have found all of the elements of a contract pursuant to the court's instructions without finding a joint venture relationship. Because the evidence on the issue was in sharp dispute, neither can we find a joint venture as a matter of law. Under these circumstances we cannot say with certainty that the cases discussed above, in all of which a joint venture or partnership was alleged or proven to exist, apply here.

D. *There was substantial evidence that the contract provided for a sale of real property by Menezes to Kaljian and Merrill*

■ Even if we were to infer that the jury, by finding a contract between the parties, also found a joint venture relationship, we would conclude the court erred in refusing to instruct on the statute of frauds. As previously discussed, the decisional law urged upon the court by Kaljian and Merrill applies only when the agreement does not contemplate a transfer of title to real property from one joint venturer or partner to another for consideration.

Respondents' evidence, including reasonable inferences therefrom, supports the conclusion that the parties' agreement was not for the sale of real property from one to the other, but only for the sharing of profits derived from the sale of College Greens. In determining whether the court should

---

[3]In fact, the joint venture instruction was read to the jury immediately following those relating to the fraud theory of liability.

have instructed on the statute of frauds, however, our inquiry is whether the instant record contains substantial evidence supporting the conclusion that the agreement involved the sale of property by Menezes to Merrill & Associates. We conclude that it does.

The first two unsigned draft agreements prepared by Kaljian included a "Section 2.01" entitled "Amount of Compensation Due Developer," which provided that the compensation payable to Kaljian and Merrill for their services would be "fifty percent (50%) of the net sales price received for each building site sold; and all direct costs and expenses as defined in this article, herein called 'off site improvement costs,' actually paid or incurred by Developer in performing this Contract."

In the third and fourth drafts, however, "Section 2.01" was changed substantially. The heading was revised to "Amount of Compensation Due Owner," and the body of the provision was changed to read: "At such time as a final map is received for a particular phase, *Developer agrees to purchase the property for $6,000. per acre.* As homes are sold Owner is to receive the remaining $9,000. per acre of the $15,000. agreed price, on a pro-rata [*sic*] basis. . . . [¶] In addition Owner is to receive 50% of the net sales price received for each building site sold after deducting all direct costs and expenses as defined in this article herein called 'off-site improvement costs' actually paid or incurred by Developer in performing this contract." (Italics added.)[4]

Other evidence indicating that the parties' contract called for a sale of property from Menezes to Kaljian and Merrill is found in testimony of the three principals.

Merrill testified that the last draft, which included the provision quoted above, contained the terms of the parties' agreement. Kaljian acknowledged that he told Guarantee Savings, in applying for a construction loan, that Merrill & Associates was going to purchase the property. And Menezes testified that his role in the arrangement with Merrill & Associates would be as an owner selling bare land. According to him, "the whole concept was we were going to sell bare land to [Merrill & Associates], they were going to develop it."

Because there was ample evidence from which the jury could have concluded that the contract, even if it created a joint venture, provided for a

---

[4]Kaljian testified that the change was made at Menezes's direction and that Menezes orally agreed to lend Kaljian and Merrill the $6,000 per acre "purchase price." Menezes denied that claim.

sale of land from one venturer to the other, instructions on the statute of frauds should have been given.

### E. *The error was prejudicial*

■ In *Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548 [34 Cal.Rptr.2d 607, 882 P.2d 298], the Supreme Court held that ". . . there is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission." (*Id.* at p. 580.) The court instead adopted the following standard:

"Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' (See *Pool* v. *City of Oakland* [1986] 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528, 728 P.2d 1163]; *LeMons* v. *Regents of University of California* [1978] 21 Cal.3d 869, 875 [148 Cal.Rptr. 355, 582 P.2d 946]; *People* v. *Watson* [1956] 46 Cal.2d 818, 836 [299 P.2d 243].) Of course, that determination depends heavily on the particular nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury.

"But the analysis cannot stop there. Actual prejudice must be assessed in the context of the individual trial record. For this purpose, the multifactor test set forth in such cases as *LeMons* and *Pool*, both *supra*, is as pertinent in cases of instructional omission as in cases where instructions were errone-ously given. Thus, when deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule* v. *General Motors Corp.*, *supra*, 8 Cal.4th at pp. 580-581, fn. omitted.)

■ In this case the state of the evidence concerning the nature of the parties' agreement was far from clear or overwhelming. Even respondents' evidence suggested several different versions of the agreement. In fact, during argument on Menezes's nonsuit motion, the trial court expressed having "trouble with just exactly what agreement you're talking about" and characterized it as a "movable" agreement. As we have noted, some of the written drafts prepared by Kaljian expressly provided for a sale of property, and Kaljian, Merrill, and Menezes gave testimony supporting that version. Looking solely at the evidence, we cannot say that it so strongly showed an agreement outside the statute of frauds that the instructional error was harmless.

None of the other factors in the *Soule* test support a finding of harmless error.

Because no statute of frauds instructions were given, the entire issue was removed from the jury's consideration. In *Soule*, by contrast, other instructions given to the jury generally encompassed the defendant's causation theory and did not foreclose a defense verdict on that theory, thus making it less likely that the erroneous refusal of a requested "pinpoint" instruction misled the jury or affected the verdict. (8 Cal.4th at pp. 581-582.)

Likewise, counsel's arguments to the jury had no curative effect. When the court refused the requested instructions, Menezes's attorney was foreclosed from arguing that any agreement reached was required to be in writing and signed by his client. The subject was simply never brought to the jury's attention.

Finally, the jury itself gave no indications that it would have reached the same verdict even if properly instructed. The deliberations were lengthy, beginning at 8:35 a.m. on October 8, 1993, and concluding with a verdict on all issues, save punitive damages, at 7:50 p.m. that day. During its deliberations the jury addressed several questions to the court, but none dealt with any substantive issue regarding the nature of the parties' contract. The first question of the special verdict forms (one each for the complaint and the cross-complaint) asked simply: "Did a contract exist between [the parties]?" The foreman inserted the answer "Yes." Postverdict polling revealed that 11 jurors voted affirmatively.

We conclude there is a reasonable probability that if the jury had been instructed on the statute of frauds defense, at least three of the jurors who found the existence of a contract would have also found it was one required to be in writing under Civil Code section 1624, subdivision (c) (agreements for the sale of real property), thus affecting the verdict.

F. *Any error in refusing statute of frauds instructions under Civil Code section 1624, subdivision (d) was harmless*

We need not decide whether the trial court erred in refusing Menezes's proposed instructions based on the statute of frauds applicable to agreements employing an agent, broker, or finder for the sale of real property because it is clear the jury did not find such a contract.[5]

Although each of the four draft agreements contained a provision appointing Kaljian and Merrill "as exclusive sales agent for each building site" in

---

[5]Although Menezes's opening appellate brief obliquely claimed error in the refusal of the broker/agent instructions, his closing brief seemingly abandoned that position, arguing only that "the statute of frauds instructions should have been given in the event the jury determined there was a non-joint venture agreement for the sale of land between Appellants and Respondents."

College Greens, Klijian expressly testified that no claim for lost real estate commissions was being made in this action. During argument, neither counsel suggested that the nature of any contract between the parties was the employment of a broker or sales agent. Instead, Kaljian and Merrill's attorney cast his clients' role as a principal in the development and sale of College Greens. Menezes's attorney characterized the arrrangement as one contemplating Kalijian and Merrill's building houses on the property. Significantly, the jury, after finding a contract existed and was breached by Menezes, awarded damages in an amount based on lost profits rather than on anticipated real estate commissions.

Considering the evidence, jury arguments, and findings, it is evident to us that the court's refusal to give instructions based on Civil Code section 1624, subdivision (d) did not prejudicially affect the verdict.

II.-V.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed and remanded for further proceedings consistent with this opinion. Costs to appellants.

Ardaiz, P. J., and Martin, J., concurred.

A petition for a rehearing was denied August 3, 1995, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied September 21, 1995.

---

*See footnote, *ante,* page 573.