Filed 5/7/26  Quinn v. Unell CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JERRY QUINN,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>AMY UNELL,<br><br>        Defendant and Appellant. | B331362<br><br>(Los Angeles County<br>Super. Ct. No. 19BBCV00351) |

APPEAL from a judgment of the Superior Court of Los Angeles County, William A. Crowfoot, Judge.  Reversed.

The Ruttenberg Law Firm, Mark A. O'Brien and Kenneth G. Ruttenberg for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

————————————

# INTRODUCTION

Jerry Quinn and Amy Unell lived together for about seven years. They were not married. During the course of their relationship, they started a family and purchased property on Foothill Boulevard in Monrovia as their residence. They began to raise their two young daughters there. Quinn worked in the thoroughbred racehorse industry. Unell worked in the hospitality industry. In 2018, because they were splitting up, they put their home on the market.

When the property was purchased, the purchase money loan and title were in Unell's name only because the lender would not rely on Quinn's credit. Each, however, contributed half the down payment for the purchase. It is undisputed they had an oral agreement to share all expenses relating to the purchase of the home—mortgage, taxes, insurance, and home warranty. When they sold the home, Unell agreed that Quinn was entitled to take half the proceeds related to the sale of the property.

Their agreement was complicated by the fact that Quinn lost his job in 2014. He could not afford to pay his full share of the expenses. He paid what he could each month. Unell made up the difference. She kept a record of what Quinn owed and paid each month and gave him a monthly accounting. Both parties agree that whatever Quinn owed in arrears on the monthly expenses for the purchase of the property would be deducted from his half of the proceeds from the sale of the house.

These facts are undisputed. Nevertheless, what prompted Quinn's lawsuit against Unell was that Unell did not give him half of the proceeds minus only what he owed on the mortgage, taxes, insurance, and home warranty (hereinafter collectively referred to as the mortgage). She also deducted monthly

2

"household expenses" pursuant to what she thought was their agreement to share *all* household expenses, not just those related to the mortgage. Those global household expenses included everything from the gardener, housekeeper and babysitter to extracurricular activities and tuition for the children to household supplies and groceries. Quinn sued Unell to recover the alleged improper deductions for these other "household expenses." In his complaint, Quinn sought $113,745 in recoverable deductions.

The trial court conducted a three-day bench trial at which both Quinn and Unell testified. The trial court issued a detailed statement of decision rendering judgment in favor of Quinn and against Unell in the amount of $48,252. We reverse the judgment.

A.    *The Complaint*

On April 25, 2019, plaintiff Quinn filed a complaint for compensatory and punitive damages for breach of joint venture contract (oral); breach of fiduciary duty; and conversion. He alleged that in 2011, he and Unell "entered into an oral joint-venture agreement through which they agreed to pool their resources (financial and otherwise) to purchase, maintain and sell for profit certain real property located in Los Angeles County." The joint venture "was formed as part of a planned move to Monrovia, California where the parties intended to (and did) start a family." Quinn alleged the terms of the joint venture agreement:

- They agreed to purchase the real property at 721 East Foothill Boulevard in Monrovia;
- Unell only would be on title;

3

- Each would contribute towards paying the mortgage, taxes, and upkeep of the residence as well as monthly utilities and miscellaneous costs associated with the residence;
- Unell would provide a greater proportion of the financial assets;
- Quinn would provide a greater proportion of labor and daily services in maintaining the property and be primarily responsible for the day-to-day care of the parties' minor child so that Unell could concentrate on her career which required her to work full-time for approximately 70–80 hours per week;
- When the residence was sold, the parties would divide the proceeds in equal shares;
- The joint venture would end once the residence was sold and the proceeds were distributed.

The complaint alleges Quinn and Unell became co-venturers in that they shared ownership of the joint venture and all the assets held under the joint venture which consisted entirely of the residence; they shared managerial control of the joint venture and its assets; and they shared the profits to be generated by the joint venture. As co-venturers, they owed fiduciary duties to each other to put each other's business and financial interest above their own.

In early 2018, Quinn and Unell decided to split up and Unell filed a paternity action in Los Angeles County. The family law court issued an order allowing Unell to move to Chicago with primary physical custody of the parties' minor children to pursue a career opportunity. The breakup of the relationship precipitated the sale of the residence.

On September 7, 2018, escrow closed on the sale of the residence and Unell received proceeds from the sale totaling $330,366.92. On September 14, 2018, Unell tendered a check to Quinn in the amount of $57,212.46.

The complaint alleges Unell provided a breakdown of how she calculated the amount of proceeds due to Quinn. Quinn objected to two allegedly improper reimbursable expense items entitled "Money Owe[d] Amy" ($95,885) and "1/2 Home Improvements" ($17,860). These deductions totaled $113,745. Quinn alleged the improper deductions amounted to a breach of their joint venture oral agreement, breach of fiduciary duty under their joint venture agreement, and conversion.

Unell filed a notice of related case alleging that a pending family law case, case No. 18PDPT00118, was related to the complaint because it involves "the same parties . . . and their efforts, after splitting up, to divide or settle their assets, expenses, and childcare duties and rights. . . . The family law case and civil case both involve who owes what monies to the other given the parties' respective incomes, assets, and needs."[1]

On August 7, 2019, Unell filed an answer generally denying all allegations in the complaint, proffering 10 affirmative defenses, and asking for attorney fees incurred in defending the lawsuit.

On February 8, 2023, the parties commenced a bench trial. Quinn dropped his cause of action for conversion. Quinn and

---

[1] Whether the parties were in a formalized domestic partnership is not in the record, nor is the disposition of the family law case. In her trial brief, Unell alleges only that Quinn was her "former domestic partner."

5

Unell each testified.  Quinn agreed he was responsible for home improvements and pared down his compensatory damages request to $95,885, the sum due under the heading "Money Owe[d] Amy."  The parties submitted a joint exhibit list.  After trial, they submitted written closing arguments.  In his reply closing argument, Quinn alleged the evidence showed he was owed $82,522.

B.    *Evidence at Trial*

Quinn and Unell each testified at trial.

1.    Quinn's Testimony

Quinn stated the house was purchased in 2012.  He and Unell contributed equal amounts for the down payment.  He is not on title because his "credit was bad."  They agreed they would own the property 50/50 and "would split proceeds 50/50 if [they] decided to sell."  They also agreed he would pay gas and electric bills; Unell would pay television, internet, trash, and water bills.  The monthly mortgage payment also included property tax and insurance.  They agreed to share the monthly mortgage payment 50/50.  Unell would pay the lender directly and Quinn would then reimburse Unell his portion.  They also agreed to share the home warranty and Quinn would pay Unell by check for that item.

Quinn conceded he did not always pay the full amount of the mortgage he owed each month.  He told Unell that when they sold the house, she would be repaid out of the sale proceeds for whatever he owed in back payments.

In 2014, he lost his job and was having difficulty keeping up on his monthly obligations until about six months before the house was sold.  Exhibit 15, a spreadsheet, represents Unell's opinion of what each is owed from the proceeds of the sale of the

6

property after deducting what Quinn owed. Quinn conceded Unell is entitled to reimbursement of the amounts she spent on home improvements and he expected that to be taken out of the final payout of sale proceeds. He agreed they agreed to split healthcare and dental expenses. Unell sent him a check for $57,212.46 out of the sale proceeds.

Quinn denied that their agreement included sharing household expenses, like grocery bills, toys or items for the children, purchases at Sam's Club (he estimated he spent $400 a month there), the babysitter, gardener and housekeeper. He did not expect to foot half the bill for Unell's living expenses. How much he decided to pay had more to do with what his income was at the time of the expense.

Quinn stated he received an accounting every month about their shared global expenses. It was an Excel spreadsheet. He gave Unell checks that were just estimates of what he owed her and what he could afford. When she got an electric car, Unell gave him a $40 monthly credit towards the electric bill. They both paid Doreen the housekeeper. He saw and paid the household deductions each month for four or five years. It did not cross his mind to object to sharing those expenses.

Quinn said he agreed to share half of the children's expenses. So he did not have any problem sharing expenses for Ralphs, Sprouts, and basketball. He never kept receipts of what he bought because he never thought he had to keep receipts.

Until he lost his job in 2014, they shared household expenses equally. Quinn acknowledged he is claiming they had a joint venture. They never used the term "joint venture." It was an "understanding." It was an oral agreement that they "owned a property together." Unell never told him he did not actually

7

owe half of the household expenses. He only agreed that his half of the household expenses would be the mortgage and home warranty. Each of them would pay for their own clothing, gas, and cell phone.

When Unell gave him what he owed each month for their expenses, he trusted that it was correct. He had a general expectation of paying around $1,800 for his monthly share of expenses.

The house sold in September 2018. Quinn had a rough idea that he owed $50,000–$60,000 in back mortgage payments. He had no problem repaying that to Unell.

Quinn testified that his main complaint is that he does not agree with Unell's estimates of what he owes her outside of the mortgage and home warranty. He testified he agreed to pay half of the mortgage, home improvements, home warranty, and also StemCyte expenses (a service they engaged that stores stem cells to be used in case of a family health emergency).

2.      Unell's Testimony

Unell and Quinn met in Chicago and decided to move to California so Quinn could focus on his career without having to travel. Unell moved to California in late November 2011 and they lived in an apartment in Sierra Madre, close to Quinn's job at Santa Anita Racetrack. Unell had a job for Wolfgang Puck Catering. She does accounting and bookkeeping every day at her job. They have two daughters together, born in 2011 and 2013.

When they moved to California, they shared living expenses and all child-related expenses. Personal clothing was each individual's responsibility as were cell phones, cars, gasoline, and medical expenses. They determined responsibility for utilities in advance. Quinn would pay electric and gas and

8

Unell would pay internet, phone, and cable. In April 2012, they bought a house in Monrovia for $664,000. They each contributed 10 percent of the down payment for a total payment of 20 percent. The property was titled in Unell's name only because Quinn's credit did not qualify.

Every month Unell printed out an accounting of their shared household expenses from an Excel worksheet. Every month was different depending on whether the kids had dental work done or registered for an activity. Quinn never questioned her about the expense printout. She would put the paper printout by his keys as he habitually put his personal items, such as keys, in the same place in their kitchen.

From 2012 until April 2014, before Quinn lost his job, he was paying the exact amount per the accountings "to the penny." When he lost his job in 2014, any payments he made became round numbers. There were many months he paid nothing. From 2014 until the time they moved, Quinn gave Unell money 23 times, never in the full amount. In June and July of 2018, he paid a higher amount.

One or the other would pay the babysitter and the school expenses, as convenient. Quinn never gave her an accounting of what he claimed he spent on household expenses, so she estimated the expenses he paid. Quinn paid the YMCA membership fees. Most of the time Unell paid the gardener and the housekeeper. They split the rent they received from the tenant living on their property.

They shared pick-up duties for the children after school. Unell made lunches for the children and dinner for the family. They would plan who would do what the night before or during her commute to work in the morning.

Unell moved out of the house on August 14, 2018. They sold the house for $930,000. Seller proceeds were $330,366.92. Unell created and gave Quinn a summary spreadsheet of what she figured Quinn owed her globally from their multiple years living together. Unell then wrote a check to Quinn for $57,212.46, which reflected the deductions on the spreadsheet.

Unell's spreadsheet, in evidence as Exhibit 15, began in 2014 because until 2014 Quinn was up to date and did not owe her anything until May 2014 when he lost his job. Quinn never questioned Unell about the amount of the proceeds check. In January 2019, he had not yet cashed it and asked her if the check was still valid.

They agreed to share expenses in the fall of 2011. Quinn agreed to pay for half of the groceries in 2011 even before they bought the house. They did not have a contract regarding household expenses. They had a conversation.

Quinn did not give Unell receipts so she estimated his purchases at Sam's Club. The duration of their agreement was for as long as they lived together. Unell moved out on August 14, 2018. They also agreed to share their children's expenses for as long as their children were alive. That would be "endless." They now share their children's expenses because of a court order.

When Unell created the spreadsheet in evidence as Exhibit 15 she did not allocate Quinn's payments to particular expenses. She just credited it to the total. Unell testified that they had a "commitment" together which Quinn honored up until the end of April 2014. He fell short of his commitment in 2014 when he was no longer able to pay the full amount. He never asked to see the backup for the monthly accountings she gave him. Unell credited him with payments he made directly to service providers

(babysitter, housekeeper) on the assumption that he had made the payments because she had not.

The parties stipulated to the admission of all joint exhibits, including Exhibit 15, the final spreadsheet Unell gave to Quinn upon the sale of the house.

C.    *Statement of Decision*

On June 21, 2023, the trial court filed its final statement of decision.  After reviewing the facts, the court held: "This entire controversy arises from the fact that, in Plaintiff's view, Defendant deducted more from Plaintiff's half of those proceeds than she should have pursuant to the parties' agreement with respect to the Property.  Defendant maintains that, to the contrary, the agreement to buy and own the Property was part of a larger agreement to share all household expenses and that Plaintiff's unpaid share of those household expenses needed to be deducted from Plaintiff's share of the sale proceeds from the Property. [¶] The Court finds that the formation of a joint venture with respect to the purchase, ownership, and eventual sale of the Property can be inferred from the actions taken by the parties, and, therefore, that a joint venture between the parties existed with respect to the Property.  While not an agreement to own the Property [as] a 'business,' as Defendant frames a key element, the purchase of real property as a 'venture,' the term used by Plaintiff in framing the same key element, can be inferred from the actions and stated expectations of the parties to acquire a house that would provide shelter, accumulate equity, and produce rental income."

The trial court went on to conclude that a "venture" to buy and own real property differs in significant respects from an agreement to share all household expenses of a family with

11

children.  The court found that a joint venture agreement can be an oral agreement but an agreement to share all household expenses of a family with children "could not be expected to be performed within one year . . . and may require some form of a writing.  Civil Code § 1624(a)."  The court concluded that "the terms of the joint venture agreement between the parties did not include any agreement with respect to the ongoing division of other household expenses.  The agreement as to the Property was simple, clear, and enforceable by this Court.  The agreement as to household expenses may have started out clear but became less so as family economic circumstances changed due to job loss, and, more significantly, the birth of children and the host of long-term legal obligations related to the care and upbringing of the children, which are under the jurisdiction of family courts."

The court ultimately found that "Defendant breached the joint venture agreement by deducting from the proceeds from the sale of the Property household expenses that were beyond the scope of the joint venture agreement. . . . Defendant did not pay Plaintiff the full amount Plaintiff was due upon sale of the Property."  The court calculated the amount due and found for Plaintiff in the amount of $48,252.  It arrived at this amount by calculating only unpaid mortgage and home warranty obligations at $58,970 and then crediting against that amount $11,337 in rental payments paid by their tenant.  The total amount Unell should have subtracted from the amount Quinn claimed ($95,885) was $47,633 which meant the amount she improperly withheld from the proceeds of the sale of the property was $48,252.

As to the remaining cause of action for breach of fiduciary duty, the trial court found no breach "when the party making the deductions has maintained and produced meticulous accounts

12

and when there is no evidence of any sort of malfeasance, failure to disclose, or misappropriation of funds. There is a disagreement between the parties over the terms of their agreement. The Court has found that Defendant over-withheld sale proceeds from the Property. But that does not amount to a breach of fiduciary duty."

## DISCUSSION

Unell contends that no substantial evidence supports the trial court's finding that the parties created a joint venture when they purchased their residence together. She also contends that the trial court used the wrong legal standard to find that the parties intended to create a joint venture. We agree and reverse the judgment.

A.     *Standard of Review*

Where the evidence is disputed, the existence or nonexistence of a joint venture is a factual issue to be determined by the finder of fact. (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 820 (*April Enterprises*).) Factual findings are reviewed for substantial evidence; evidence is substantial if any reasonable trier of fact could have considered it reasonable, credible, and of solid value. (*Lam v. Bureau of Security & Investigative Services* (1995) 34 Cal.App.4th 29, 36.)

Where the evidence is undisputed, the appellate court reviews the trial court's determination as a question of law. (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143.)

13

B.    *Applicable Law*

"A joint venture has no corporate or partnership designation.  It is an undertaking by two or more persons jointly to carry out a single business enterprise for profit." (*Nelson v. Abraham* (1947) 29 Cal.2d 745, 749.)  "The elements necessary for its creation are: (1) joint interest in a common business; (2) with an understanding to share profits and losses; and (3) a right to joint control." (*April Enterprises*, *supra*, 147 Cal.App.3d at p. 819.)  Such a venture or undertaking may be formed by parole agreement or it may be assumed as a reasonable deduction from the acts and declarations of the parties.  (*Ibid.*)  Whether a joint venture actually exists depends on the intention of the parties.  (*Ibid.*)

A joint venture exists when there is an agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control.  (*Connor v. Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 863.)  A joint venture can be formed by a written or an oral agreement or by an agreement implied by the parties' conduct.  (*Simmons v. Ware* (2013) 213 Cal.App.4th 1035, 1052.)  However, while a joint venture "can be created with little formality" there must still be an agreement based upon a "meeting of the minds as to the essential structure and operation of the alleged joint venture." (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 215 (*Bustamante*).)  Importantly, the facts must show an intent to jointly carry out a for-profit enterprise.  (*Ramirez v. Long Beach Unified School Dist.* (2002) 105 Cal.App.4th 182, 193.)

We conclude the trial court applied the wrong legal definition of a joint venture in concluding that the purchase of the residence here constituted as such. In addition, no substantial evidence supports a finding of a joint venture under the correct definition of the term. On those two grounds, we reverse the judgment.

### 1.    Definition of Joint Venture

It is beyond cavil that a joint venture must involve a common interest in a business. "Business" is defined by Corporations Code section 16101, subdivision(a)(1) as a "trade, occupation, and profession." Here, the trial court acknowledged in its statement of decision that a joint venture must involve a business and that the parties did not intend to own the property as a business. Yet it went on to find that it was sufficient that the parties had embarked on a "venture" when together they decided to buy the residence. The trial court essentially found a "non-business venture." By deleting the element that the parties must intend to "jointly carry out a business enterprise for profit," the trial court deleted one of the elements necessary to find a joint venture. Under any standard of review, this redefinition of joint venture to omit a finding of an intent to jointly run a business enterprise for profit was error.

### 2.    Substantial Evidence

Even under the correct legal definition of joint venture, no substantial evidence supported a finding that Quinn and Unell intended to and did enter into a joint venture together. They were a romantically-involved couple who wanted to buy a residence for their growing family. Both worked in their chosen professions—Quinn as a thoroughbred horse trainer and Unell as

15

a full-time employee in the hospitality industry. There was no evidence that either of them purchased the house to run it as a business for profit. Granted, in California there is an expectation that when a residential property is bought and later sold, it will probably generate a profit. But there was no evidence whatsoever that either party purchased the house, resided in it, fixed it up, and paid for its upkeep with the intent to "flip it" for a profit or even eventually sell it at a profit. Indeed, the evidence at trial was that they were looking for a place to live with their nearly one-year-old daughter. Quinn testified that he and Unell had agreed they would own the property 50/50 and "would split proceeds 50/50 *if* [they] decided to sell." (Italics added.) They ended up selling the house seven years later not because they were ready to cash in their profit, but because their romantic relationship had ended and they were splitting up. Neither testified to anything else. To find a joint venture under these circumstances and on this record is to turn every family home purchase into a business transaction between the family members who are parties to the purchase and to saddle every family that owns their own home with the concomitant fiduciary responsibilities and burdens every true joint venture carries with it, as Quinn attempted to do here. (See, e.g., *Kaljian v. Menezes* (1995) 36 Cal.App.4th 573, 584 [joint venture places the parties in a confidential fiduciary relationship]; *Myrick v. Mastagni* (2010) 185 Cal.App.4th 1082, 1084 [joint venturers are jointly and severally liable for noneconomic damages]; *Nelson v. Abraham*, *supra*, 29 Cal.2d at p. 750 [joint venturers are fiduciaries with a duty of disclosure and liability to account for profits]; *Milton Kauffman, Inc. v. Superior Court* (1949) 94 Cal.App.2d 8, 17 [joint venturers have duty to render on

16

demand true and full information of all things affecting the joint venture].)

Besides the absence of evidence to support a finding that the parties intended to jointly control the enterprise for profit, the terms of any such venture were insufficiently precise to permit its enforcement and to establish a meeting of the minds. (*Bustamante, supra,* 141 Cal.App.4th at p. 215 [evidence must demonstrate agreement on essential structure and operation of joint venture].)  Indeed, the trial court found that the parties, in good faith, had different conceptions of what the agreement between them required.  Quinn thought their agreement covered mortgage and upkeep expenses only; Unell thought their agreement to share mortgage and upkeep expenses was simply an extension of their preexisting agreement to share all "household expenses."  The parties could not even agree on which expenses fell under the rubric of mortgage and upkeep.  It was not until the day of trial that Quinn advised the court that he was now agreeing that kitchen remodeling expenses were covered as mortgage expenses.  These uncertainties quite possibly arose because, as both parties testified, they felt no need to have, and they had no, direct conversations about the terms of their agreement.  (Per Unell, it was a conversation, a commitment, not a contract; per Quinn, it was an understanding and he felt no need to question Unell about the monthly accountings.)  There was no claim that the parties had an agreement on how title would be held other than Quinn could not be on the title because of his unfavorable credit rating.  There is no claim that the parties had agreed on when or if it would ultimately be sold for profit.  At best, the facts establish that Quinn and Unell decided to purchase a property as their principal residence where they

17

would live with their two daughters and that they shared *all* household expenses, including the mortgage, without question for seven years before they broke up.  Quinn failed to carry his burden of establishing a joint venture.  (*Sully v. Kern Drilling Corp.* (1954) 126 Cal.App.2d 651, 654 [burden of proof]; 40 Cal.Jur.3d (2022) Joint Ventures, § 20 ["The burden of proof in respect to the existence of a joint venture agreement is on the party alleging it."].)

## DISPOSITION

The judgment is reversed.  Quinn to pay costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

VIRAMONTES, J.

SCHERB, J.

18