Filed 10/13/20 Dilonell v. Bua CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| FRIDA DILONELL,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>SHANE DAVID BUA,<br><br>Defendant and Respondent. | B298212<br>(Los Angeles County<br>Super. Ct. No. BC657879)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT*:

The opinion filed September 20, 2020, in the above-entitled matter is ordered MODIFIED as follows:

1. On page 20 of the opinion, the last sentence of the first paragraph is deleted in its entirety and replaced with "Dilonell contributed remodeling costs to the home but she proffered no evidence that Bua agreed to repay some or all of her expenses as part of any joint venture for ownership of the house. Thus, any agreement to repay her remodeling expenditures standing alone does not establish a joint venture."

These modifications do not change the judgment.

The petition for rehearing is DENIED.

_____

MANELLA, P.J.          WILLHITE, J.          CURREY, J.

Filed 9/21/20  Dilonell v. Bua CA2/4  (unmodified opinion)

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| FRIDA DILONELL,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>SHANE DAVID BUA,<br><br>      Defendant and Respondent. | B298212<br><br>(Los Angeles County<br>Super. Ct. No. BC 657879) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Rupert Byrdsong, Judge. Affirmed.

Andrew Schoettle for Plaintiff and Appellant.

Plotkin, Marutani & Kaufman, Jay J. Plotkin for Defendant and Respondent.

Plaintiff and Appellant Frida Dilonell seeks compensation for an ownership interest in real property she contends she purchased jointly with Defendant and Respondent Shane Bua. Dilonell further seeks palimony and reimbursement for her improvements to the property. The trial court granted nonsuit in favor of Bua after Dilonell's opening statement, concluding the statute of limitations and statute of frauds barred Dilonell's claims, and subsequently entered judgment for Bua. On appeal, Dilonell primarily argues she timely filed her complaint, and the statute of frauds does not bar her claims. She also contends the trial judge exhibited bias and became embroiled. We reject her contentions and affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Our review of a nonsuit granted after opening statement generally is limited to the facts proffered in plaintiff's opening statement. (See, e.g., *Hurn v. Woods* (1982) 132 Cal.App.3d 896, 902 [addressing whether opening statement alludes to facts sufficient to prove case]; *Abeyta v. Superior Court* (1993) 17 Cal.App.4th 1037, 1041 [same]; *Galanek v. Wismar* (1999) 68 Cal.App.4th 1417, 1424 [same]; cf. *Weyburn v. California Kamloops, Inc.* (1962) 200 Cal.App.2d 239, 240 [appellate court considers complaint and facts asserted in opening statement].) We, therefore, include facts from Dilonell's complaint, as well as the parties' declarations filed in connection with Bua's earlier motion to expunge a lis pendens, only for the purpose of providing context and to make the factual assertions in the opening statement more understandable.[1] In

---

[1]     As discussed *post*, even these additional facts, if proved, would not have saved Dilonell's claims.

2

reviewing the trial court's ruling on the nonsuit motion, we disregard conflicting facts and engage in every presumption in plaintiff's favor.

### 1. *Dilonell's Complaint.*

When Dilonell met Bua, she worked as an aesthetician at a laser clinic. She and Bua became romantically involved in July 2006, and Bua moved into Dilonell's apartment in Santa Monica. Bua, who Dilonell described as having a "controlling personality," was a police officer with the Los Angeles Police Department. He came from a family with extensive real estate experience and took over the couple's finances based on his greater knowledge and life experience. Although at first the couple shared expenses, Dilonell later began to pay most of them.

In mid 2007, after Dilonell's landlord requested extra rent because Bua was staying at her apartment full time, the couple decided to rent a different apartment together. Bua gave Dilonell a "move-in" ring, which she also described as an "engagement ring." After they located an apartment, Bua claimed he had poor credit, so he asked Dilonell to add him to her credit card so he could improve his credit.[2] They moved in together in August 2007.

Although Bua refused to be on the lease for the new apartment, he insisted that due to his greater knowledge and experience in life, he should handle their finances. At first they shared expenses, but after a time, Dilonell again paid more than half of the couple's expenses. After Dilonell left her job to pursue a nursing degree, she became dependent upon Bua to provide for her, and he promised to do so.

---

[2] Later, Bua admitted to Dilonell that his credit was in good standing.

Bua requested they both contribute $10,000 to a certificate of deposit at Bank of America in preparation for a joint home purchase. In 2009, the parties visited real estate agents and decided on Culver City as an area where they could afford a home. Around this time, Dilonell added Bua to her credit card.

In early 2010, however, the parties took a "break." Bua moved in with a friend, but left his belongings at Dilonell's apartment. The parties reconciled in August 2010, and agreed they would work toward the common goal of a successful financial future together. Around that time, they agreed to merge their assets and began to look for a house. In May 2011, they found a house to purchase in Culver City. Bua told Dilonell he would take care of everything related to the house and their joint ownership of the property.

The property was financed with a favorable VA loan that Bua, a veteran, obtained. Dilonell provided $5,200 towards the purchase. Dilonell at first believed her contribution would form part of the down payment, but Bua later told her it was for closing costs. At the close of escrow in July 2011, the escrow agent brought closing papers to Dilonell's house. But Bua stopped her from signing them, saying "trust me," and, "I will explain later," and that the papers were not final. Later, Dilonell learned she was not going to be listed on title, ostensibly because of requirements related to Bua's VA loan. After the escrow closed, in August 2011, Bua told Dilonell he would add her to the title in December, and on Thanksgiving 2011, Bua's mother gave Dilonell a ring.

The parties moved into the house. Dilonell advanced sums totaling $31,000 for remodeling, and expected that Bua would reimburse her for half. Dilonell continued to pay house-related bills, and although she was not on title, Dilonell was on Bua's homeowners insurance policy for the house. In March 2012, Bua became upset

4

when Dilonell asked when she would be put on title, but approximately six months later, he told her she would be added to title when a refinance was complete.

After attending an out of town wedding in September 2012, Dilonell returned to the home to find that Bua wanted her to move out. At his request, she returned his mother's ring. Before she moved out, she requested that Bua reimburse her for the home-related costs. He did not. After she moved out, she was afraid to ask Bua for monies she believed were due to her.

In December 2012, she moved to another home that contained mold, causing her severe adverse health consequences for several years (e.g., loss of memory, lack of clarity in thinking, headaches, vertigo, tremors, and inability "to function normally on a daily basis"). She contends the health consequences included cognitive malfunction and impeded and delayed her assertion of her rights in the house.

In early 2015, Dilonell returned the keys to the house and was removed from the homeowner's insurance. Eventually, in March 2015, Bua paid her a total of $25,000 with two checks. One for $5,000 was marked "House $" and the other was for $20,000. Bua told her to get a lawyer.

On April 17, 2017, Dilonell filed her complaint, asserting causes of action for breach of contract, breach of fiduciary duty, fraud, money had and received, quantum meruit, unjust enrichment, conversion, quiet title, and declaratory relief, and seeking the imposition of a constructive trust, and partition. By these claims, she sought an undivided one-half interest in the Culver City property, palimony of not less than $250,000, and reimbursement for improvements made to the property. (See *Marvin v. Marvin* (1976) 18 Cal.3d 660, 685 (*Marvin*).) Dilonell contended her health

problems prevented her from earlier asserting her claims for reimbursement from Bua, and as a result, she did not learn she had been excluded from title on the house until 2015. Dilonell claimed she was entitled to at least $250,000 because of her contributions and her one-half interest in the property (which had increased in value).

### 2. *Bua's Response to Dilonell's Allegations.*

On April 19, 2017, Dilonell recorded a lis pendens against the Culver City property. In his motion to expunge the lis pendens, Bua portrayed a different relationship.[3] According to Bua, the parties' relationship lasted from August 2007 to Spring 2010. The two met in 2006, when Bua lived in Hermosa Beach and Dilonell lived in Santa Monica. In August 2008, the parties moved into Dilonell's apartment and agreed to split all expenses. After Dilonell informed Bua that it was traditional in her native Sweden for a woman to get a "move in" ring, Bua bought her a $2,200 ring. Bua did not consider it to be an engagement ring. Bua also purchased a ring from his mother, but never gave it to Dilonell. Bua never proposed to Dilonell, they were never engaged to be married, nor did he promise to support her.

According to Bua, the couple's relationship ended in Spring 2010. At that time, they continued to be friends; after a few months Bua moved back in with Dilonell as friends. In Spring 2011, Bua began to look for a house. He made several verbal offers to Dilonell for them to purchase a house together as an investment. Bua wanted Dilonell to sell her car and use the proceeds to help with a down payment, but she refused. Because Bua would not buy a house with

---

[3] Bua submitted a declaration describing the parties' relationship and the purchase of the Culver City property in support of his motion to expunge the lis pendens.

6

Dilonell unless she put money in, he looked for a property on his own. Bua denied any oral or written agreement to purchase a house with Dilonell.

In May or June 2011, Bua looked on his own for a home and found the Culver City property. Bua purchased the home with a VA loan and he was the only person on title to the property and the only obligor on the loan. Bua characterized Dilonell's payment of $5,200 as a loan to facilitate closing of the sale.

Bua and Dilonell moved into the house in September 2011. They each had their own bedroom as they were no longer romantically involved. Bua let Dilonell live in the house rent-free, and Dilonell advanced monies for improvements to the bathroom at the property. At this time, Bua insisted the parties agreed that Dilonell's advances did not grant her any ownership interest in the property and Bua would pay her back. Dilonell did make one mortgage payment for Bua before she moved out.

By spring 2012, Dilonell found a place to move. The residence burned, however, and she was unable to move, so she remained in the Culver City property. Finally, Dilonell moved out of the house in October or November 2012. Bua disputed the amount but agreed to pay a portion of the sums claimed. He also demanded his mother's ring back. In April 2015, Bua paid Dilonell $25,000 in "full satisfaction" of all sums owed her.

3. *Denial of Motion to Expunge Lis Pendens.*

The trial court denied the motion to expunge, finding that based upon Bua's acknowledgment of the parties' relationship and their shared expenses at the time of purchase, there was probable validity to Dilonell's claim. Further, the evidence showed Bua advised the loan officer the parties were buying a house together, and did not characterize the $5,000 down payment from Dilonell as a

"loan." Although the parties separated in 2012, Dilonell maintained keys to the property until 2015, when Bua gave her money on account of her improvements to the property.

      *4.     Bench Trial.[4]*

In opening statement, Dilonell's counsel recited Dilonell's basic factual assertions, adding that in 2011, the couple looked for a house with a large enough lot to add a second unit. The Culver City property was zoned R4, providing an opportunity to expand and build. Bua obtained a VA loan and Dilonell put up $5,000, as reflected on the HUD-1 closing statement. Bua assured Dilonell she would be added to title once they refinanced the property. In reliance, Dilonell remodeled the kitchen and master bath and closet. Dilonell expended $50,000 and made three $3,000 monthly mortgage payments, while Bua continued to manage their joint Certificate of

---

[4]      There is no reporter's transcript of the proceedings. Dilonell filed an "Appellant's Notice Designating Record on Appeal," Judicial Council form APP-003, and checked the box indicating that she was proceeding with an "Agreed Statement." Attached to the form, however, is a document entitled "Joint Settled Statement for April 2, 2019." The document states it is a "settled statement" that is the "joint record of the oral proceedings that took place on April 2, 2019[.]" It is signed by both parties. The Joint Settled Statement expressly notes it is not a transcript, does not contain "literal quotes," and is "a description and approximation of what occurred." Unlike a settled statement prepared under California Rules of Court, rule 8.137, subdivision (b)(2), it has not been reviewed or certified by the trial judge. Rather, the document takes the form of an agreed statement, consisting of a summary of the trial court proceedings as agreed upon by the parties without judicial approval, in lieu of a reporter's transcript and/or clerk's transcript. (Cal. Rules of Court, rule 8.836, subd. (a).)

8

Deposit investment. Even after moving out in 2012, Dilonell kept her keys to the property and maintained personal property at the house. Only in early 2015 did Dilonell learn that Bua was repudiating their agreement and he told her to get an attorney. Dilonell asserted she was entitled to approximately $370,000 to $625,000, a half-interest in the current value of the property based upon an appraisal establishing the value of the property as between $1,240,000 to $2,050,000.

At the conclusion of Dilonell's opening statement, counsel and the trial court engaged in colloquy. Bua's counsel then made his nonsuit motion, and the court heard argument on it. Bua's counsel argued the statute of limitations ran in 2011, that a contract for real estate must be in writing, there was no palimony relationship, and that during her deposition Dilonell admitted the parties did not share a checking account and expenses were split. Dilonell's counsel argued there were indicia of a confidential relationship based on Bua's law degree, superior knowledge and experience with real estate, and Dilonell's clear trust of Bua.[5]

According to the "Joint Settled Statement," which as noted above expressly disclaims being a verbatim record of the proceedings, the trial court expressed doubt about the existence of fiduciary duties between the couple, and asked Dilonell's counsel something along the lines of "what authority can you cite that would establish a fiduciary duty between these two, between the couple?" In response, rather than citing legal authority, Dilonell's counsel

---

[5] Bua also filed a written motion for nonsuit. Dilonell filed a written opposition to the motion. It is not clear when the judge received and reviewed these documents. At a minimum, the trial court would have had an opportunity to review them over the lunch recess.

answered something akin to, "By the trust [between the parties], access to the house [after she moved out], [retaining] keys [after she moved out], [and storing] her shoes and clothes [at the house after moving out]." The "Joint Settled Statement" reports the trial court responded in substance, "When I got divorced, I left personal belongings at the house and I don't think that entitled me to half of the equity in the house." The court then asked about Dilonell's witnesses, and what testimony Dilonell's counsel expected from them.

Dilonell's counsel later objected to the court's commentary about leaving personal items in the house. Again according to the Joint Settled Statement, the court responded along the lines of, "I was only replying to you, citing my own experience as an example, when talking about moving out." The court reportedly commented that the case did not reflect a breach of fiduciary duty, and there was no written agreement regarding the house, thus running afoul of the statute of frauds. The court reportedly continued, stating in substance, "Defendant bought the property. Plaintiff is not on the deed or loan application. Having him on her credit card to boost his credit makes no sense. He already had a good credit rating. I don't see how Plaintiff can get equity in the house[;] they didn't get married, there was no breach of a promise to get married, and there was no breach of representation to get married. The Statute of Limitations has passed for these claims to be brought."

Dilonell's counsel argued that the parties had a joint venture, evidenced by Dilonell's $5,200 contribution and her expenditures to remodel the house. Her counsel also argued that she reasonably delayed in bringing suit based upon her confidential relationship with Bua, and thus it was not until his repudiation of the relationship in 2015 that the statute began to run.

The trial court granted nonsuit. The court found no fiduciary relationship, that the statute of frauds barred Dilonell's claims, and that the time had passed for Dilonell to bring suit. Dilonell filed a verified statement of disqualification asserting improper bias based on the court's statement concerning its own divorce, and the court ordered it stricken as groundless. Judgment was entered for Bua, and this appeal ensued.

## DISCUSSION

Dilonell argues she asserted sufficient facts in her opening statement to overcome the bar of the statute of limitations because she can establish estoppel and delayed discovery of her claims. She also argues the existence of a joint venture was sufficient to overcome the statute of frauds. She further asserts the trial judge's comments referencing his own divorce demonstrated impermissible judicial bias and embroilment.

I.     **Standard of Review and Basis for Nonsuit.**

Dilonell asserts that nonsuit may only be granted on grounds specifically raised by Bua, namely, the statute of limitations and statute of frauds. We conclude both of those grounds are sufficient to support nonsuit and thus we need not look beyond the issues raised in Bua's nonsuit motion.

Code of Civil Procedure section 581c, subdivision (a) provides that, after the plaintiff presents his or her opening statement, the court may grant nonsuit, if warranted. A defendant is entitled to nonsuit after the plaintiff's opening statement only if the trial court determines that, as a matter of law, the evidence to be presented is insufficient to permit a finding in the plaintiff's favor. (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 117-118; *Galanek v.*

11

*Wismar* (1999) 68 Cal.App.4th 1417, 1424.) When determining whether the plaintiff's evidence is sufficient, the court must accept as true all favorable facts asserted in the plaintiff's opening statement, indulge all legitimate inferences from those facts, and disregard all conflicting evidence. *(Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 930.) We independently review the ruling on a motion for nonsuit, guided by the same rules that govern the trial court. (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541-1542.) We will not sustain the judgment """unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff, a judgment for the defendant is required as a matter of law."' [Citations.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.) Although "'a judgment of nonsuit must not be reversed if plaintiff's proof raises nothing more than speculation, suspicion, or conjecture, reversal is warranted if there is "some substance to plaintiff's evidence upon which reasonable minds could differ. . . ." [Citations.]' [Citations.]" (*Claxton v. Atlantic Richfield Co.* (2003) 108 Cal.App.4th 327, 335.)

Generally, a court may not grant nonsuit on grounds that were not specified in the motion. (*Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1200.) As explained in *Timmsen v. Forest E. Olson, Inc.* (1970) 6 Cal.App.3d 860, an appellate court can consider grounds not before the trial court "'only if it is clear that the defect is one which could not have been remedied had it been called to the attention of the plaintiff by the motion.' [Citation.]" (*Id.* at p. 868; *Sands v. Walnut Gardens Condominium Assn.* (2019) 35 Cal.App.5th 174, 176 [appellate court may affirm only on logic stated in the motion for nonsuit, unless the defect would have been impossible to cure].)

Here, we need not look beyond the grounds Bua asserted in the trial court, namely, statute of frauds and statute of limitations, to find that the trial court properly granted nonsuit based on the undisputed facts. "It is true that a nonsuit is proper when the plaintiff's evidence conclusively establishes a defense. [Citations.]" (*Van Buskirk v. McClenahan* (1958) 163 Cal.App.2d 633, 638.) As discussed below, Dilonell's claims accrued in December 2012, and she is not entitled to any tolling of the statute of limitations based on delayed discovery or estoppel. Further, Dilonell failed to establish a joint venture sufficient to take her outside the statute of frauds on her claim to an interest in the Culver City property.

## II.     The Statute of Limitations Bars All of Dilonell's Claims.

Dilonell asserts Bua is estopped to assert the statute of limitations because he lulled her into forbearing litigation by leading her to believe he would reimburse her expenses and place her on title. She also asserts she reasonably delayed discovering Bua's alleged fraud and breach of fiduciary duty because she was unaware he would not place her on title until he tendered the $25,000 in April 2015. We disagree.

The nature of the right sued upon rather than the form of action or the relief demanded determines the applicability of the statute of limitations. (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 23.) In general, a cause of action accrues when it is complete in all its elements. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397.) "" 'Ordinarily this is when the wrongful act is done and the obligation or the liability arises, but it does not 'accrue until the party owning it is entitled to begin and prosecute an action thereon.' " [Citation.] In other words, "[a] cause of action accrues 'upon the occurrence of the last element essential to the cause of action.' " [Citations.]' [Citation.]"

(*Howard Jarvis Taxpayers Assn v. City of La Habra* (2001) 25 Cal.4th 809, 815.)

Dilonell's claims here are predicated on contract and fraud—namely, the parties' alleged joint venture to purchase and own and improve the property, and Bua's alleged promise to provide *Marvin* support. Contrary to Dilonell's assertion that the claims accrued in March or April 2015 when Bua gave her $25,000, all of her claims accrued when Bua repudiated the parties' agreement in December 2012 by excluding her from ownership of the property by not putting her on title, refusing to reimburse her for the improvements, and failing to pay any palimony. Dilonell moved from the Culver City property, and although she left personal property there and had keys to the property, at no time after that did Bua make any representations about putting Dilonell on title, refinancing for the purpose of putting her on title, or otherwise providing funds to her. Thus, in December 2012, all of the elements of Dilonell's claims were complete, and she could have brought suit. When Bua ultimately gave her money in early 2015, the statute of limitations did not start running anew.

The longest statute of limitations applicable to Dilonell's claims is three years, making her complaint filed in April 2017 untimely.

The statute of limitations for breach of fiduciary duty is four years, unless the gravamen of the complaint is fraud (as is the case here), in which case it is three years.[6] (*American Master Lease LLC v. Idanta Partners Ltd. (*2014) 225 Cal.App.4th 1451, 1479.) Three

---

[6] Because the statute of limitations has run on Dilonell's claims, we need not consider the merits of such claims, including her claim that a fiduciary relationship existed. We only assume one for purposes of calculating the statute of limitations.

years similarly govern Dilonell's claims for fraud (Code Civ. Proc., § 338, subd. (d)), constructive trust where premised on fraud (*Davies v. Krasna* (1975) 14 Cal.3d 502, 515-516 [constructive trust is not a substantive device but a remedy, action seeking to establish a "constructive trust is subject to the limitation period of the underlying substantive right"]), quiet title where premised on fraud (*Walters v. Boosinger* (2016) 2 Cal.App.5th 421, 427, 433), unjust enrichment based upon claims of fraud (*Federal Deposit Ins. Corp. v Dintino* (2008) 167 Cal.App.4th 333, 348), conversion (Code Civ. Proc. § 338, subd. (c)(1)) and declaratory relief (*Maguire v. Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719, 734 [duration of limitations period applicable to a declaratory relief action determined by the nature of the underlying obligation]).

Two years governs claims for money had and received based on oral contract (Code Civ. Proc., § 339, subd. (1)), and for breach of oral contract based upon *Marvin* claims. (*Kurokawa v. Blum* (1988) 199 Cal.App.3d 976, 985,989 [oral or implied-in-fact agreement between nonmarital cohabitants to "provide" for each other or share earnings or property rights is subject to the two-year statute of limitations].) Two years similarly governs claims for quantum meruit. (*Leighton v. Forster* (2017) 8 Cal.App.5th 467, 490.)[7]

---

[7] There is no statute of limitations for partition because it is a remedy and a co-tenant has the right to demand partition at any time (*American Medical International, Inc. v. Feller* (1976) 59 Cal.App.3d 1008, 1013.) The claim accrues when the partition action is filed or, at the very earliest, when the plaintiff demands partition. (*Akley v. Bassett* (1922) 189 Cal. 625, 645-646.) Nonetheless, because Dilonell's partition remedy is based upon her other time-barred claims, she would not have the right to demand partition and hence the claim is substantively barred.

Neither delayed discovery nor estoppel salvages Dilonell's claims.

A plaintiff can rely on delayed discovery if she or he "could not have discovered facts supporting [a] cause of action within the applicable statute of limitations." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 809 (*Fox*).) If so, an action may be brought upon a showing that "despite diligent investigation of the circumstances of the injury," the plaintiff "could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period." (*Ibid.)* In other words, to invoke the delayed discovery doctrine, Dilonell must show "'the time and manner of discovery *and* . . . the inability to have made earlier discovery despite reasonable diligence.' [Citation.]" (*Id.* at p. 808.)

Here, the facts upon which Dilonell could have sued were always in plain view, and there was nothing more to discover. Bua never falsely told Dilonell that she was actually on title, only that he would put her on title. She knew she was not on title when the escrow closed. She knew she was not on title throughout the time the parties lived in the Culver City property in 2011 and 2012. She also knew that Bua did not refinance the property to place her on title at any time before she moved out. Bua also failed to reimburse her for the improvements or pay her support, thereby breaching his alleged promises to do so. Once Dilonell moved out in December 2012, no one contends Bua continued to make promises, nor did he put her on title. Thus, all of the elements of Dilonell's claims were in place and nothing was hidden.

Further, equitable estoppel does not apply here for the same reasons: no facts were unknown to or concealed from Dilonell, and Bua did not act in a manner that delayed Dilonell from suing. Equitable estoppel to assert a statute of limitations defense "'arises

16

as a result of some conduct by the defendant, relied on by the plaintiff, which induces the belated filing of the action.' [Citation.]" (*Prudential-LMI Com. Ins. v. Superior Court* (1990) 51 Cal.3d 674, 689-690; *Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 384.) "Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must [reasonably] rely upon the conduct to his injury. [Citations.]" (*Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305; *Santos v. Los Angeles Unified School Dist.* (2017) 17 Cal.App.5th 1065, 1076 (*Santos*) [plaintiff's reliance must be reasonable under the circumstances].) The existence of equitable estoppel may be decided as a matter of law "when the undisputed evidence is susceptible of only one reasonable inference[.]" (*Santos, supra,* 17 Cal.App.5th at p. 1076.)

Here, Dilonell cannot benefit from equitable estoppel. Dilonell always knew she was not on title to the property. Further, after December 2012, she knew that Bua was not putting her on title, paying *Marvin* palimony, or reimbursing for her costs of remodeling or the closing costs. He did not engage in any conduct after that time causing her to delay filing suit.

Finally, other than asserting cognitive impairments from the ill effects of mold, Dilonell offered no facts demonstrating this disability prevented her from bringing her claims in a timely fashion. The only statutory basis for tolling based upon mental infirmity requires Dilonell to establish insanity sufficient to establish complete inability to function. (Code Civ. Proc., § 352, subd. (a).) A plaintiff is "insane" if "'incapable of caring for his [or her] property or

17

transacting business or understanding the nature or effects of his [or her] acts[.]'"(*Feeley v. S. Pac. Transp. Co.* (1991) 234 Cal.App.3d 949, 951-952 [action tolled while plaintiff was comatose as a result of injuries he received on defendant's premises].) Here, Dilonell has not met this high bar for showing disability. Instead, she has merely asserted that her illness from mold made it difficult for her to attend to the affairs of daily life.

## III. The Statute of Frauds Bars Dilonell's Claim To An Interest In The Culver City Property.

Dilonell argues that because the parties formed a joint venture to purchase the property, the statute of frauds is not a bar to her claims. We disagree.

The statute of frauds provides that an interest or conveyance in real estate must be in writing, signed by the party to be charged. (Civ. Code, § 1624, subd. (a); *Kaljian v. Menezes* (1995) 36 Cal.App.4th 573, 582.) Here, it is undisputed that Bua is the only party on title. Thus, Dilonell must establish an exception to the statute of frauds to prevail on her claims.

Such an exception exists for joint ventures, where an oral agreement regarding real property may be enforced. (*Kaljian v. Menezes, supra,* 36 Cal.App.4th at pp. 583-586.) Where the parties agree to purchase real property for their joint account, but one person takes title to the property in his or her own name, the agreement will be enforced on the theory that the existence of the joint venture places the parties in a confidential relationship. (*Id.* at pp. 583-584.)  By violating fiduciary duties, "the offending party constituted himself a constructive trustee for the benefit of the other [party]. [Citation.]"  (*Ibid.*)

18

"'A joint venture exists where there is an "agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control."' [Citations.]" (*Simmons v. Ware* (2013) 213 Cal.App.4th 1035, 1053.) "'A joint venture can be formed by a written or an oral agreement or by an agreement implied by the parties' conduct.'" (*Id* at p. 1052.) However, while a joint venture "can be created with little formality" there must still be an agreement based upon a "meeting of the minds as to the essential structure and operation of the alleged joint venture[.]" (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 215.)

"There are three basic elements of a joint venture: the members must have joint control over the venture (even though they may delegate it), they must share the profits of the undertaking, and the members must each have an ownership interest in the enterprise. [Citation.]" (*Orosco v. Sun-Diamond Corp.* (1997) 51 Cal.App.4th 1659, 1666.) The right of joint participation in the management and control of the business is an essential element of a partnership or joint venture. (*Simmons v. Ware, supra,* 213 Cal.App.4th at p. 1056.) "'"Absent such right, the mere fact that one party is to receive benefits in consideration of services rendered or for capital contribution does not, as a matter of law, make him a partner or joint venturer. [Citations.]"' [Citations.]" (*Ibid.*, quoting *Kaljian v. Menezes, supra,* 36 Cal.App.4th at p. 586.)

Here, there was no joint venture because the terms of any such venture were insufficiently precise to permit its enforcement and establish a meeting of the minds. The proffered evidence does not show that Bua and Dilonell had agreed upon the percentage of her ownership interest, or the nature of Dilonell's contribution to the

19

venture through her improvements to the property or advancement of closing costs. There is no claim that the parties had an agreement on how title would be held (joint tenants or tenancy in common), or how the property would be managed (or by whom), or whether or when it would ultimately be sold for profits. (See *Bustamante v. Intuit, supra,* 141 Cal.App.4th at p. 215 [evidence must demonstrate agreement on essential structure and operation of joint venture].) On the contrary, the facts alleged by Dilonell at most establish that Bua purchased the home for himself with a VA loan in his own name and borrowed the closing costs from Dilonell—costs he later repaid. Dilonell contributed remodeling costs to the home but she proffered no evidence that Bua agreed to repay some or all of her expenses. Thus, her remodeling expenditures do not establish a joint venture.

## IV. Judicial Bias.

Finally, Dilonell contends the trial judge was biased because he allegedly made clear that his own personal experience with divorce predetermined his view of the case, by pointing out that his leaving personal belongings at his house did not entitle him to half of the equity. Further, the judge observed that Dilonell's $5,200 contribution to the house did not entitle her to "dip into [Bua's] investment and ruin his future," and that such sums constituted a gift. Dilonell also contends that by transforming himself from judge to "litigant," the judge improperly "embroiled himself in the litigation." We disagree with Dilonell's contentions.

Every litigant has a due process right to an impartial decision maker. (*Today's Fresh Start, Inc. v. Los Angeles County Office of Educ*ation (2013) 57 Cal.4th 197, 212.) But due process requires judicial disqualification only under the "'most "extreme facts."'" (*People v. Cowan* (2010) 50 Cal.4th 401, 456-457.) To establish a due

20

process violation, the appellant has the burden of showing "'"'the probability of actual bias on the part of the judge[.]'"'" (*Id.* at p. 456.) "The appellate court's role is not to examine whether the trial judge's behavior left something to be desired, or whether some comments would have been better left unsaid, but to determine whether the judge's behavior was so prejudicial it denied the party a fair . . . trial. [Citation.] Mere expressions of opinion, based on observation of the witnesses and evidence, do not demonstrate judicial bias. [Citation.] . . . . [¶] A constitutional finding of judicial . . . bias is appropriate only when 'extreme facts' demonstrate a probability of actual bias. [Citation.]" (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 589.) The same is true for comments made in response to a nonsuit motion.

Here, Dilonell has failed to show how the trial court's purported comments establish it held a predetermined view of the case.[8] Rather, the court's supposed editorializing on the evidence proffered in Dilonell's opening statement demonstrates only that the court viewed the evidence as insufficient to prove her claims, particularly with respect to the existence of a fiduciary duty. The court's purported comments merely underscored its conclusion that

---

[8] Dilonell contends the judge's comments indicate bias or embroilment, but failed to provide a reporter's transcript of the proceedings or a Settled Statement certified by the court to substantiate her claims; rather, as discussed in footnote 4, *ante,* the Joint Settled Statement affirmatively disclaims that it provides an accurate record of what the judge said. Nuance and context matter in evaluating Dilonell's contentions, so appropriate review requires knowing what was said, rather than an approximation. But even assuming the Joint Settled Statement accurately reflects what was said at trial, no bias or embroilment is shown.

Dilonell's retention of a key to the house, and continued storage of her personal property there after moving out, were insufficient to establish a fiduciary relationship. The judge's comments do not constitute the "extreme facts" necessary to establish judicial bias. Nor do they demonstrate embroilment. Rather, the court merely appeared to be expressing skepticism that the proffered evidence supported Dilonell's claims, which in the context of argument on a nonsuit motion, seems entirely appropriate. Indeed, as this opinion makes clear, we share the trial judge's belief that the proffered evidence was insufficient.

## DISPOSITION

The judgment of the superior court is affirmed. Respondent is to recover costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

CURREY, J.

We concur:

MANELLA, P.J.

WILLHITE, J.