Filed 4/2/26  CM Laundry v. Valadez CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| CM LAUNDRY, LLC, | B342304 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19GDCP00341) |
| v. | |
| ANTONIO VALADEZ et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, William A. Crowfoot, Judge.  Affirmed.

Ross, Peter W. Ross and Charles Avrith for Plaintiff and Appellant.

Klapach & Klapach and Joseph S. Klapach for Defendants and Respondents.

Law Offices of Henry N. Jannol and Rebecca D. Wester for Defendant and Respondent Antonio Valadez.

Law Offices of Tracey P. Hom and Tracey P. Hom for Defendant and Respondent Hermelinda Rendon.

CM Laundry, LLC, sought to add Antonio Valadez and Hermelinda Rendon as judgment debtors to a default judgment it had obtained against Classic Laundry and Finishing, Inc. CM Laundry alleged Valadez was liable as Classic Laundry's alter ego and that Rendon was liable as Valadez's economic partner.

After a bench trial, the trial court ruled in Valadez and Rendon's favor. It declined to pierce Classic Laundry's corporate veil and found Rendon had no involvement with Classic Laundry and no business relationship with Valadez.

On appeal, CM Laundry challenges the sufficiency of the evidence underlying the trial court's alter ego findings. It also seeks reversal because the court failed to apply Evidence Code sections 412 and 413 to draw negative inferences from Valadez's failure to produce certain Classic Laundry records, and because the court misallocated to CM Laundry the burden of proof on the alter ego issue. Further, CM Laundry maintains Rendon is liable on the default judgment as Valadez's economic partner. We reject these contentions and affirm the judgment.

## BACKGROUND

Valadez formed Classic Laundry in 2008. He owned 100 percent of Classic Laundry's shares and served as the company's sole officer, director, and agent for service of process. From 2010 to 2012, Classic Laundry operated an industrial laundry out of a facility in Maywood, California, owned by Valadez and his romantic partner, Rendon.[1]

Classic Laundry ceased operations in September 2012. Later that month, Valadez leased the Maywood property to

---

[1] We discuss additional evidence of Classic Laundry's formation and operation in part I.B of the Discussion, *post*.

2

Ernesto Munoz, a former CM Laundry officer and shareholder. Since October 2012, Munoz and, later, his daughter have used the property to operate an industrial laundry.

Since 2007, CM Laundry has operated an industrial laundry in Gardena, California. In October 2013, CM Laundry discovered Luis Rodriguez — one of its founding shareholders and its one-time president — had been embezzling funds by facilitating the company's payment of fraudulent invoices his three co-conspirators submitted.

## I.    *CM Laundry obtains a default judgment against Classic Laundry.*

In 2014, a CM Laundry employee sued the company for alleged wage-and-hour law violations. In that action, CM Laundry filed a cross-complaint alleging several of its employees had conspired with Munoz and Rodriguez to steal its assets and equipment to develop Classic Laundry as a competitor to CM Laundry. The pleading did not mention Valadez and instead alleged Munoz to be a Classic Laundry "officer and shareholder" who was "primarily responsible for its day-to-day operations." Based on these allegations, CM Laundry asserted against Classic Laundry causes of action for aiding and abetting breach of fiduciary duty, conversion, intentional interference with contractual relations, and violation of Business and Professions Code section 17200.

In April 2014, Valadez was served with the cross-complaint as Classic Laundry's agent for service of process. At the time, he believed the cross-complaint had mistakenly named Classic Laundry as a defendant, as the company had ceased operations in 2012 and he had no links to the other parties. For this reason, and because it did not name him individually as defendant,

3

Valadez did not pursue Classic Laundry's defense of the cross-complaint.

In June 2016, CM Laundry obtained a default judgment against Classic Laundry for $2,480,143.71.

II.      ***The trial court declines to add Valadez and Rendon as judgment debtors to the default judgment.***

Three years later, in August 2019, CM Laundry filed the action giving rise to this appeal. Its operative first amended complaint alleges Valadez created Classic Laundry for the "sole purpose of aiding and abetting" Rodriguez's embezzlement "and setting up a competing, industrial laundry" with machinery and assets stolen from CM Laundry. CM Laundry also alleges Classic Laundry failed to follow corporate formalities, and Valadez and Rendon used Classic Laundry funds to pay their personal expenses. Based on these allegations, CM Laundry alleges Valadez and Rendon were Classic Laundry's alter egos and, therefore, (1) sought to amend the judgment under Code of Civil Procedure section 187 by replacing Classic Laundry with Valadez and Rendon as judgment debtors; (2) asserted an independent action under Code of Civil Procedure section 680.010 to hold Valadez and Rendon jointly and severally liable on the default judgment; and (3) sought a declaratory judgment holding Valadez and Rendon jointly and severally liable on the default judgment.

After a bench trial, the trial court issued a thorough statement of decision in Valadez and Rendon's favor. It determined Valadez was not liable because he "was not and is not the alter ego of Classic Laundry." On this point, the court found Valadez did not control the 2014 lawsuit, that Valadez and Classic Laundry had separate personalities and did not share a

4

unity of interest, and that recognizing Classic Laundry's corporate form would not sanction a fraud or promote injustice against CM Laundry.

As to Rendon, the trial court concluded "there was no evidence upon which to find that Rendon should be a judgment creditor . . . in lieu of, or in addition to, Classic Laundry. According to the court, the evidence showed that while Rendon and Valadez collectively managed household affairs, Rendon was not involved with Classic Laundry's ownership, operations, or the like. Accordingly, the court rejected CM Laundry's assertion that Valadez and Rendon were "akin to joint venturers" both liable as alter egos of Classic Laundry.

CM Laundry timely appealed.

## DISCUSSION

### I. *Valadez was not Classic Laundry's alter ego.*

#### A. Forfeiture

Valadez and Rendon assert CM Laundry forfeited its challenges to the sufficiency of the evidence underlying the trial court's alter ego findings by failing to fairly present in its opening brief the evidence supportive of those findings.

This argument does not persuade. It is true that appellants who cite and discuss only the evidence favorable to their position forfeit their challenge to the sufficiency of the evidence supportive of the judgment. (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408.) But that is not the case here. While the opening brief's background section certainly casts the facts in CM Laundry's favor, it does acknowledge some of the evidence on which the trial court relied. Similarly, the brief's discussion section identifies the evidence supportive of the court's

5

findings and asserts why, in CM Laundry's view, that evidence is insufficient as a matter of law.

Nonetheless, having reviewed CM Laundry's opening brief, we note that it repeatedly failed to support its evidentiary references with record citations, particularly in its discussion section, as required by California Rules of Court. (Cal. Rules of Court, rule 8.204(a)(1)(C); see *L.O. v. Kilrain* (2023) 96 Cal.App.5th 616, 619–620.) Record citations in a brief's statement of facts do not cure the lack thereof in its discussion. (See *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16.) "Rule 8.204(a)(1)(C) is intended to enable the reviewing court to locate relevant portions of the record 'without thumbing through and rereading earlier portions of a brief.' [Citation.] To provide record citations for alleged facts at some points in a brief, but not at others," as CM Laundry did here, "frustrates the purpose of that rule . . . ." (*Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 590, fn. 8.)

Notwithstanding the omissions in CM Laundry's brief, which made the court's review more difficult, we address CM Laundry's challenges to the trial court's alter ego findings on the merits.

## B. Substantial evidence supports the trial court's alter ego findings.

"Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations." (*Sonora Diamond Corp v. Superior Court* (2000) 83 Cal.App.4th 523, 538 (*Sonora*).) But under the alter ego doctrine, "[a] corporate identity may be disregarded — the 'corporate veil' pierced — where an abuse of the corporate privilege justifies holding the

6

equitable ownership of a corporation liable for the actions of the corporation." (*Id.* at p. 538.) The doctrine "is an extreme remedy, sparingly used." (*Id.* at p. 539.)

Code of Civil Procedure section 187 authorizes courts "to amend a judgment to add an alter ego of an original judgment debtor, and thereby make the additional judgment debtor liable on the judgment. [Citation.] Amending a judgment to add an alter ego of an original judgment debtor ' "is an equitable procedure based on the theory that the court is not amending the judgment to add a new defendant but is merely inserting the correct name of the real defendant." ' " (*Highland Springs Conference & Training Center v. City of Banning* (2016) 244 Cal.App.4th 267, 280 (*Highland Springs*).)

A judgment creditor may seek to add a judgment debtor as the alter ego of an original defendant by filing a motion under Code of Civil Procedure section 187 or by filing an independent action on the judgment. (*Highland Springs*, *supra*, 244 Cal.App.4th at pp. 280, 288.) Regardless of the procedural vehicle, the judgment creditor must first demonstrate the new party is the original defendant's alter ego by showing: (1) there is a unity of interest and ownership between the corporation and its equitable owner such that the separate personalities of the corporation and the shareholder do not in reality exist; and (2) an inequitable result will follow if the acts are treated as those of the entity alone. (*Triplett v. Farmers Ins. Exchange* (1994) 24 Cal.App.4th 1415, 1421 (*Triplett*); *Sonora*, *supra*, 83 Cal.App.4th at p. 539.) Upon making this "threshold" showing of alter ego, the judgment creditor must then establish "the new party had controlled the litigation, thereby having had the opportunity to litigate, in order to satisfy due process concerns." (*Triplett*, at p.

7

1421.) The decision to add a judgment debtor as an alter ego "lies within the sound discretion of the trial court [citation] and will not be disturbed on appeal if there is a legal basis for the decision and substantial evidence supports it." *(Highland Springs, supra,* 244 Cal.App.4th at p. 280.)

On substantial evidence review, we simply determine " 'whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact.' [Citation.] In so doing, we accept all evidence that supports the judgment, disregard contrary evidence, and draw all reasonable inferences to uphold the judgment. [Citation.] 'It is not our role to reweigh the evidence, redetermine the credibility of witnesses, or resolve conflicts in the testimony . . . .' " (*Slone v. El Centro Regional Medical Center* (2024) 106 Cal.App.5th 1160, 1173 (*Slone*).) Thus, we "will uphold a judgment that is supported by substantial evidence even if substantial evidence to the contrary also exists." (*DeNike v. Mathew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 382 (*DeNike*).) "The testimony of a single witness may constitute substantial evidence as long as it is not physically impossible or inherently improbable." (*Id.* at p. 381.)

Applying these principles, we conclude substantial evidence supports the trial court's findings that Valadez and Classic Laundry did not share a unity of interest, and that no inequity would arise from recognizing Classic Laundry's corporate form. Absent these "threshold" alter ego showings, we need not address whether Valadez controlled the 2014 litigation giving rise to the default judgment. (*Triplett, supra,* 24 Cal.App.4th at p. 1421 [amendment of a judgment to add an alter ego defendant "requires *both* (1) that the new party be the alter ego of the old party *and* (2) that the new party had controlled the litigation"].)

8

## 1. Unity of Interest

"[M]any factors" bear upon whether a shareholder and a corporation share a unity of interest. (*Highland Springs, supra*, 244 Cal.App.4th at p. 281; see also *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 838–840 [listing factors].) Those factors include one individual's ownership of all stock in a corporation; commingling of the individual's and corporation's funds and other assets; an individual holding out that he is personally liable for the corporation's debts; disregard of corporate formalities; failure to maintain adequate corporate records; absence of corporate assets and inadequate capitalization; and the use of the corporation as the mere shell, instrumentality, or conduit for the individual's personal affairs. (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1073.) These factors are not exhaustive. (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 812.) " ' "No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the [alter ego] doctrine." ' " (*Misik v. D'Arco*, at p. 1073.)

After considering the presence and absence of these factors, the trial court found "Valadez and Classic Laundry had separate personalities and there was no unity of interest" between them. Substantial evidence supports this finding, and we disagree with CM Laundry's position that "there is undisputed evidence that every single factor in favor of finding a unity of interest and ownership is present here."

Valadez created Classic Laundry with the help of his accountant, Ed Chermisqui. Chermisqui testified he prepared and filed Classic Laundry's articles of incorporation and

9

statement of information with the Secretary of State, both of which were admitted into evidence at trial.  He also obtained a book including corporate documents and places for recording minutes and stock transfers.

Subsequently, Valadez testified, he opened a checking account for Classic Laundry at Bank of America with an initial deposit of $200.  He then contributed $79,000 in capital to the company from his personal funds, of which $35,000 to $40,000 was used to purchase washers and dryers.

According to Valadez, Classic Laundry had two Bank of America accounts during its years of operation.  One account was a general account, and the other was for payroll.  Valadez testified he used a payroll company to pay his employees.  The trial court admitted into evidence copies of W-2 forms prepared by Chermisqui and issued to Classic Laundry's employees for the 2011 and 2012 tax years.

Valadez testified Classic Laundry customers made payments out to the company, not to him personally.  Valadez deposited those payments into Classic Laundry's bank account. He stated he never deposited checks from Classic Laundry customers into his personal checking account at Chase, a different bank.  Nor did he use Classic Laundry funds to pay his personal bills.  In addition, Valadez never collected a salary from Classic Laundry, as the company lacked sufficient funds to pay him.

Valadez testified Classic Laundry filed tax returns for the 2010, 2011, and 2012 tax years.  According to Valadez, Classic Laundry did not operate in 2009 and, therefore, did not file a tax return for that year.  Chermisqui prepared Classic Laundry's tax returns, and Valadez received K-1 forms from the company.

The trial court admitted into evidence copies of Classic Laundry's tax returns for the 2010, 2011, and 2012 tax years. In 2010, Classic Laundry reported $1,176,270 in gross revenue, $84,478 in taxable income, and payment of $458,191 in salaries and wages. That year, the company yielded $24,060 in profits. Valadez testified he did not withdraw any of Classic Laundry's profits, and instead left the funds in the company for payment of future bills.

In 2011, Classic Laundry lost an important customer. Consequently, its tax return for that year reported $417,475 in gross revenue and a loss of $53,516. Then, in 2012, Classic Laundry's tax return reported $405,028 in gross revenue and a loss of $49,152.

Valadez testified that based on Classic Laundry's poor financial performance, he decided to close its business in 2012. He informed his customers and employees of Classic Laundry's closure, and he closed the company's bank accounts. He took no funds from Classic Laundry upon its closure, as the company had none left. Valadez did not know how to close a corporation with the Secretary of State and, consequently, took no formal steps to do so. He assumed that once Classic Laundry ceased its business operations, the company would close automatically. He believed Classic Laundry no longer existed after 2012.

The evidence above shows Classic Laundry was adequately capitalized and observed corporate formalities. It shows the company operated a legitimate industrial laundry business and was not a mere shell or conduit for Valadez to conduct his personal affairs. Although he was Classic Laundry's sole shareholder, officer, and director, Valadez took care to segregate his assets, finances, and liabilities from Classic Laundry's. He

11

occasionally infused Classic Laundry with additional capital and never used company funds or assets for his own purposes.

In arguing for reversal, CM Laundry asserts the trial court should have placed greater weight on the evidence suggesting Classic Laundry failed to observe corporate formalities, and should have inferred from the evidence that the company was undercapitalized. These arguments fail because they misunderstand our role on substantial evidence review. (See *Slone, supra,* 106 Cal.App.5th at p. 1173; see also *DeNike, supra,* 76 Cal.App.5th at p. 382.)

CM Laundry further contends reversal is required based on "uncontradicted evidence that Valadez diverted all [of Classic Laundry's] assets to himself." (Italics omitted.) Specifically, it asserts Valadez appropriated lease payments due to Classic Laundry on the Maywood property, benefits related to the company's wastewater discharge rights, the company's laundering equipment, and its customer list.

For several reasons, we disagree. First, substantial evidence demonstrates Valadez and Rendon, rather than Classic Laundry, owned the Maywood property. Therefore, Valadez properly collected and kept Munoz's rent for Rendon and himself.

Valadez testified he purchased the property in 2007, before Classic Laundry was formed, using his personal funds, a cash disbursement from his other corporation, APS Finishing, Inc., a loan from a bank, and an SBA loan. The escrow company's final statement for the property's purchase confirms Valadez's testimony. Likewise consistent with his testimony are the grant deed by which Valadez and Rendon obtained title to the property, and the deed of trust securing their bank loan. Those documents

12

reflect that although unmarried, Valadez and Rendon took title as "husband and wife as joint tenants."

Valadez testified, and the trial court specifically agreed, Munoz's lease mistakenly lists Classic Laundry as the lessor. Both he and Munoz understood Valadez to be the owner of the property, not Classic Laundry. For this reason, Munoz paid rent to Valadez personally.

Next, the trial court appropriately found the record lacked credible evidence showing Classic Laundry, after ceasing operations, owned transferable water discharge rights of substantial value that Valadez looted.

Contrary to CM Laundry's argument, the trial court was not required to accept and find dispositive the testimony of Gary Freedman. Freedman is a director and managing member for CM Laundry's parent company, Citizens of Humanity. He testified industrial laundries purchase wastewater discharge rights by the unit based on prices set by the marketplace. Each unit permits the laundry to discharge a set amount of wastewater into the sewage system. CM Laundry originally purchased 660 units for $1.2 million, and when trying to sell some of its units three to four years prior to trial, Freedman was quoted a price of $3,000 per unit.

So long as it does not act arbitrarily, "a trier of fact may reject the evidence of a witness, including an expert, even though that evidence is uncontradicted." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1206, fn. 27.) Here, the trial court rationally found Freedman's testimony unpersuasive as to the existence, ownership, value, or transferability of water discharge rights related to Classic Laundry based on his lacking "personal knowledge of Classic

13

Laundry's process" and inability to testify to "the current market cost for water discharge rights . . . ." Instead, the court credited Valadez's testimony that the water rights cost him a sum certain that he never recouped.

Nor was the trial court required to find the water discharge rights of significant value based on Munoz's payment of $9,000 in monthly rent for the Maywood property or Classic Laundry's stipulation in 2011 and 2012 to judgments in favor of County Sanitation Districts Nos. 1 and 2, respectively, totaling nearly $140,000 for wastewater treatment and conveyance fees due because of the company's status as an industrial discharger. CM Laundry cites no evidence tying the value of Munoz's rent or that of the stipulated judgments to Classic Laundry's ownership of high-value, transferable wastewater discharge rights, let alone to any looting of assets by Valadez. And the court did not have to accept CM Laundry's speculations regarding such a connection. (*California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 45.)

Finally, substantial evidence supports that Valadez did not steal Classic Laundry's customer list or its laundry equipment. As to the former, Valadez testified that by 2012, Classic Laundry only had four or five customers, with whom he did no further business after the company ceased operations. As to the latter, Munoz testified that when he leased the Maywood property in 2012, the washers and dryers purchased by Valadez were old and "almost fall[ing] into pieces." Munoz uninstalled those machines and bought new ones to replace them. Valadez disposed of the old machines at the junkyard, for which he received approximately $200 to $300.

14

In sum, substantial evidence supports the trial court's finding that Valadez and Classic Laundry had separate personalities and shared no unity of interest.

## 2. Inequity

Arguing recognition of Classic Laundry's corporate form would result in injustice, CM Laundry reiterates its contentions that Valadez stole Classic Laundry's assets and that Classic Laundry was undercapitalized. We have already addressed and rejected those arguments in part I.B.1, *ante*.

CM Laundry additionally argues that acknowledging Classic Laundry's corporate existence would unfairly preclude it from "recover[ing] the funds stolen from it that ended up at Classic Laundry . . . ." In support, CM Laundry asserts that by entering the default judgment in its favor, the trial court found true its allegation that Classic Laundry was built on funds embezzled from CM Laundry. This finding, CM Laundry contends, "cannot now be contested" under res judicata principles and, thus, should have justified the alter ego doctrine's application here.

CM Laundry's argument appears to invoke issue preclusion. Historically known as collateral estoppel, "[i]ssue preclusion prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824, italics omitted (*DKN*).) The doctrine "applies (1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or in privity with that party." (*Id.* at p. 825.) The fourth requirement limits issue preclusion's reach "[i]n accordance with due process." (*Id.* at p. 824.) "The

15

party asserting [issue preclusion] bears the burden of establishing these [threshold] requirements." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 (*Lucido*).)

Even where issue preclusion's threshold requirements are met, "policy considerations may limit its use where the limitation on relitigation underpinnings of the doctrine are outweighed by other factors." *(Jackson v. City of Sacramento* (1981) 117 Cal.App.3d 596, 603; see also *Lucido, supra*, 51 Cal.3d at p. 343 ["the public policies underlying [issue preclusion] — preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation — strongly influence whether its application in a particular circumstance would be fair to the parties and constitutes sound judicial policy"].) That is, issue preclusion "is not an inflexible, universally applicable principle." (*Jackson v. City of Sacramento,* at p. 603.) In determining whether "fairness concerns" militate against issue preclusion's application, courts " ' "balance the need to limit litigation against the right of a fair adversary proceeding in which a party may fully present his case." ' " (*Thompson v. Crestbook Insurance Company* (2022) 81 Cal.App.5th 115, 129.)

CM Laundry does not couch its res judicata arguments within this well-settled analytical framework. Instead, CM Laundry cites *Fitzgerald v. Herzer* (1947) 78 Cal.App.2d 127 (*Fitzgerald*) for the proposition that a default judgment "is res judicata as to all issues aptly pleaded in the complaint" such that the "defendant is estopped from denying in a subsequent action any allegations contained in the former complaint." (*Id.* at p. 132.) This invocation of *Fitzgerald* does not adequately address the threshold requirements of issue preclusion or the equitable

concerns regarding whether it should apply here and how. CM Laundry, therefore, has forfeited this point. (*Picerne Construction Corp. v. Castellino Villas* (2016) 244 Cal.App.4th 1201, 1211 ["the appellant must support claims of error with meaningful argument"].)

Moreover, *Fitzgerald* is distinguishable. There, the appellate court considered whether a defendant's discharge in bankruptcy released him from a default judgment entered in a personal injury action where the plaintiff's injuries resulted from the defendant's grossly careless and reckless conduct. (*Fitzgerald*, *supra*, 78 Cal.App.2d at pp. 128–129.) Answering the question in the negative, the court then addressed the default judgment's effect on the plaintiff's subsequent, post-bankruptcy action seeking a new judgment against the same defendant in the amount of the default judgment, with interest. (*Id*. at pp. 130–131.) Here, unlike the defendant in *Fitzgerald*, Valadez was not a party to the action giving rise to the default judgment. After all, CM Laundry brings this very proceeding to add Valadez as a party.

Substantial evidence otherwise supports the trial court's finding. As noted above, Valadez testified he bought the Maywood property using personal funds, funds from APS Finishing, and two loans. From his personal funds, he infused Classic Laundry with capital to purchase the washers and dryers used in the company's operative years. When served with the cross-complaint in 2014, Valadez was unfamiliar with CM Laundry and, other than Munoz, whom he knew as his tenant and nothing more, he recognized none of the parties named in the pleading. Valadez denied meeting Rodriguez and stated neither he nor Classic Laundry received any money, equipment, or other

17

assets from Rodriguez, Munoz, CM Laundry, or anyone affiliated with CM Laundry.

In sum, the trial court appropriately concluded recognition of Classic Laundry as an entity separate from Valadez would not sanction a fraud or promote injustice.

**II.** ***Evidence Code sections 412 and 413 did not require the trial court to draw inferences adverse to Valadez.***

Its substantial evidence arguments aside, CM Laundry asserts the trial court abused its discretion by failing to draw, under Evidence Code sections 412 and 413, negative inferences from Valadez's inability to produce certain Classic Laundry records, such as its bank statements and customer invoices, to corroborate his testimony. These statutes, CM Laundry argued, required the court to infer the missing documents "were unfavorable to" Valadez.

Evidence Code sections 412 and 413 do not apply here. And even if they did, these statutes were permissive, as they imposed no mandatory obligation on the trial court.

Evidence Code section 412 provides: "If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." (*Ibid*.) This statute, then, " 'only applies when it can be shown that a party is in fact in possession of or has access to better and stronger evidence than was presented.' [Citations.] It does not apply to evidence that does not exist." (*Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 362.)

CM Laundry identifies no evidence requiring a finding that Valadez possessed or had access to the records he failed to produce. On the contrary, by asserting "virtually all of Classic

18

Laundry's records were gone by the time" of discovery in the present case, CM Laundry essentially concedes those documents do not exist. Evidence Code section 412, therefore, does not apply.

Evidence Code section 413, in turn, punishes and deters the intentional spoliation of evidence by permitting the finder of fact to infer "evidence which one party has destroyed or rendered unavailable was unfavorable to that party." (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 11.) Specifically, section 413 states: "In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case." (*Ibid.*)

In arguing the trial court should have invoked Evidence Code section 413, CM Laundry essentially challenges its finding that the Classic Laundry documents at issue were innocently lost due to the passage of time and "Valadez's poor record-keeping." As substantial evidence supports the trial court's factual finding (see *Slone, supra,* 106 Cal.App.5th at p. 1173), CM Laundry's argument falters.

As discussed above, Valadez testified he believed Classic Laundry did not exist after it ceased operations and closed its bank accounts in 2012. Classic Laundry owed no debts to CM Laundry. It never did business with CM Laundry. Valadez heard of CM Laundry for the first time when he was served with the cross-complaint in 2017, five years after Classic Laundry's closure.

Immediately after winding Classic Laundry down, Valadez testified, he kept the company's records in a box stored at the APS Finishing office. By the time of trial, he no longer knew where the documents were, as "it's been a long time." Valadez acknowledged he had been asked to look for Classic Laundry documents "many times" for purposes of this case but was unable to find them. He stated: "I was asked all the time to look here, to look there, to look for all the evidence, to focus myself. I look[ed] everywhere. Why would I want to hide anything? I would like to have . . . the documents to turn them in, but I didn't find them." Further, Valadez testified that in 2018, he called the bank and asked for Classic Laundry's records. Unable to fulfill his request, the bank explained to Valadez that it no longer had the records "because it had been a long time."

On this record, the trial court reasonably inferred Valadez did not willfully destroy Classic Laundry's records to avoid liability to CM Laundry, and that they had instead been misplaced or lost due to the passage of time. Accordingly, Evidence Code section 413 does not apply.

In any event, even assuming Evidence Code sections 412 and 413 did apply, neither statute *required* the trial court to draw adverse inferences from Valadez's inability to produce the Classic Laundry records at issue. The statutes *permit* the trier of fact to view and interpret the evidence through a certain lens under specific circumstances. (See Evid. Code, §§ 412 ["the evidence offered *should* be viewed with distrust" (italics added)], 413 ["the trier of fact *may* consider . . . the party's willful suppression of evidence" (italics added)].) The court, therefore, retained discretion as the trier of fact "to decide whether an inference should be drawn and the weight to be accorded the

inference." (*People v. Massie* (2006) 142 Cal.App.4th 365, 374.) CM Laundry has shown no abuse of that discretion here.

In sum, the trial court did not commit reversible error by declining to infer Classic Laundry's missing records would have worked against Valadez's favor.

## III. *Reversal is unwarranted based on the trial court's allocation of the burden of proof.*

According to CM Laundry, the trial court prejudicially erred by allocating to it, the party seeking court action, the burden of proving Valadez was Classic Laundry's alter ego. Specifically, relying on public policy and the fact Valadez alone possessed the evidence bearing upon the alter ego factors, CM Laundry argues reversal is required because the trial court should have shifted the burden of proof to Valadez on the alter ego issue.

We disagree. Even assuming the trial court misallocated the burden of proof to Valadez — an assumption that does not reflect our inclination towards CM Laundry's position — any such error was harmless.

In a bench trial, "misallocation of the burden of proof is not 'reversible error *per se*,' [and] does not vitiate the substantial evidence rule . . . ." (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 736.) For nearly a century, the rule has been where substantial evidence supports the findings on which the court's decision rests, its "misallocation of the burden of proof [is] harmless because there [is no] reasonable probability the court's decision would have been different in absence of the error." (*Navigators Specialty Ins. Co. v. Moorefield Construction, Inc.* (2016) 6 Cal.App.5th 1258, 1288; *Merrill v. Normandie Corp.* (1930) 110 Cal.App. 621, 623 [in a bench trial, "the question of

21

upon whom rests the burden of proof become[s] purely academic when the trial court has found upon substantial evidence that the essential facts have been proved"].)

As discussed above, substantial evidence supports the trial court's express findings that Valadez and Classic Laundry shared no unity of interest, and that recognition of Classic Laundry's corporate form would not sanction a fraud or result in inequity. (See Discussion part I.B, *ante*.)  Under these circumstances, even if the trial court had misallocated the burden of proof on the alter ego issue, its error was not prejudicial.  Reversal is not required.

## IV.   *Rendon is not liable for the default judgment.*

Lastly, CM Laundry seeks reversal of the judgment as to Rendon because "she was Valadez's business partner" and, thus, "under basic principles of partnership law, Rendon is liable to the same extent as Valadez."

CM Laundry's contention fails for two reasons.  First, it incorrectly assumes Valadez is liable on the default judgment as Classic Laundry's alter ego.  (See Discussion, parts I and II, *ante*.)

Second, substantial evidence demonstrates — as the trial court found — Rendon and Valadez did not create a partnership or joint venture to co-operate an industrial laundry business through Classic Laundry.  (See *Holmes v. Lerner* (1999) 74 Cal.App.4th 442, 445 [existence of partnership is a factual finding reviewed for substantial evidence].)

" 'A joint venture exists where there is an "agreement between the parties under which they have . . . a joint interest[ ] in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control." [Citations.]  An essential element of a partnership or joint

venture is the right of joint participation in the management and control of the business.  [Citation.]  Absent such right, the mere fact that one party is to receive benefits in consideration of services rendered or for capital contribution does not, as a matter of law, make him a partner or joint venturer.' " (*Kaljian v. Menezes* (1995) 36 Cal.App.4th 573, 586.)  As discussed above, Valadez testified — and Classic Laundry's statement of information confirms — he was Classic Laundry's sole shareholder, officer, and director.  Rendon testified she had no ownership in Classic Laundry and has never worked for the company.  She did not have signing authority for Classic Laundry.  Nor did she have access to the company's checking accounts.  She received no funds from Classic Laundry, and Classic Laundry has never paid for her expenses.

Accordingly, substantial evidence demonstrates Rendon had no right to participate in Classic Laundry's management or control and did not receive a share of the company's profits.  For this reason, the trial court correctly declined to hold her liable on the default judgment as Valadez's partner or joint venturer.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.

SCHERB. J.

We concur:

STRATTON, P. J.               WILEY, J.

23